**Mark HOHIDER; Robert DiPaolo, On Behalf of Themselves and All Others Similarly Situated**

v.

**UNITED PARCEL SERVICE, INC.; Does 1–100**

**Preston Eugene Branum, On Behalf of Himself and All Others Similarly Situated**

v.

**United Parcel Service, Inc.; Does 1–100**

United Parcel Service, Inc., Appellant.

No. 07–4588.

United States Court of Appeals,
Third Circuit.

Argued Nov. 20, 2008.

Filed: July 23, 2009.

Mark A. Perry, Esquire, (Argued), Eugene Scalia, Esquire, Gibson Dunn & Crutcher, Washington, D.C., Rachel S. Brass, Esquire, Gibson Dunn & Crutcher, San Francisco, CA, Perry A. Napolitano, Esquire, Reed Smith, Pittsburgh, PA, for Appellant.

Judith S. Scolnick, Esquire, (Argued), Scott & Scott, New York, NY, David R. Scott, Esquire, Scott & Scott, Colchester, CT, Geoffrey M. Johnson, Esquire, Scott & Scott, Cleveland Heights, OH, Christian C. Bagin, Esquire, Wienand & Bagin, Pittsburgh, PA, for Appellees, Mark Hohider, Robert DiPaolo and Preston Eugene Branum.

Rae T. Vann, Esquire, Norris Tysse Lampley & Lakis, Washington, D.C., for Amicus Curiae–Appellant, The Equal Employment Advisory Council.

Robin E. Shea, Esquire, Constangy Brooks & Smith, Winston–Salem, NC, for Amicus Curiae–Appellant, The Society for Human Resource Management.

John H. Beisner, Esquire, O'Melveny & Myers, Washington, D.C., for Amicus Curiae–Appellant, Chamber of Commerce of the United States of America.

Michael D. Lieder, Esquire, Sprenger & Lang, Washington, D.C., for Amici Curiae–Appellees, The National Employment Lawyers Association and AARP.

Brad Seligman, Esquire, Impact Fund, Berkeley, CA, for Amici Curiae–Appellees, The Public Interest Law Center of Philadelphia, Disability Rights Network of Pennsylvania, Disability Rights Education and Defense Fund, Inc., Disability Rights Legal Center, The Impact Fund, The Legal Aid Society—Employment Law Center, The National Disability Rights Network, New Jersey Protection and Advocacy, Inc.

Before: SCIRICA, Chief Judge, and RENDELL, Circuit Judges, and O'CONNOR, Associate Justice (Ret.).[*]

## OPINION OF THE COURT

SCIRICA, Chief Judge.

At issue in this interlocutory appeal under Fed.R.Civ.P. 23(f) is whether the District Court properly certified a nationwide class of employees alleging a pattern or practice of unlawful discrimination under Title I of the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12101–12117. Analogizing to pattern-or-practice discrimination suits brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, the District Court found certain of named plaintiffs' claims and requested relief could be adjudicated on a classwide basis in a manner consistent with Rule 23(a) and (b)(2). We disagree, and will reverse the court's grant of class certification and remand for proceedings consistent with this opinion.

---

* The Honorable Sandra Day O'Connor, *Associate Justice (Ret.)* of the Supreme Court of the United States, sitting by designation.

## I.

Named plaintiffs Mark Hohider, Robert DiPaolo, and Preston Eugene Branum ("plaintiffs") are employees of package-delivery company United Parcel Service, Inc. ("UPS"). They brought this civil action against UPS on behalf of themselves and all others similarly situated, alleging UPS has adopted and implemented company-wide employment policies that are unlawfully discriminatory under the ADA. On March 10, 2004, plaintiffs Hohider and DiPaolo filed suit under the ADA and the Rehabilitation Act,[1] and on June 29, 2004, they moved for class certification. The District Court permitted limited discovery with respect to the class certification motion.[2] On November 4, 2004, while that discovery was proceeding, plaintiff Branum filed a similar suit against UPS, alleging discriminatory practices in violation of the ADA and seeking class treatment of his claims. Counsel for Hohider and DiPaolo moved to consolidate the two cases, which UPS opposed. The court initially granted consolidation for the purpose of discovery only, and subsequently consolidated the cases for all purposes.

Plaintiffs' claims of unlawful discrimination focus on UPS's alleged treatment of employees who attempt to return to work at UPS after having to take leave for medical reasons. Hohider, DiPaolo, and Branum each suffered an injury of some sort during the course of their employment with UPS, leaving them unable to return to their respective previous positions at the company without some form of permanent medical restriction.[3] Their subsequent attempts to resume work at UPS were unsuccessful. According to plaintiffs, UPS, as a matter of companywide policy, refuses to offer any accommodation to employees seeking to return to work with medical restrictions, effectively precluding them from resuming employment at UPS in any capacity because of their impaired condition. Namely, plaintiffs allege UPS

(1) enforce[es] a "100% release" or "no restrictions" unwritten policy, which prohibits employees from returning to UPS in any vacant position unless the employee can return to his or her last position without any medical restrictions;

(2) disseminat[es] a written corporate "ADA compliance policy," which is implemented nationwide to delay and avoid providing accommodations, that is illegal, both on its face and as applied;

(3) us[es] uniform job descriptions, which intentionally fail to describe the essential functions of available UPS

---

**1.** The Rehabilitation Act claim was withdrawn in response to a motion to dismiss by UPS.

**2.** UPS divides its operations within the United States into sixty geographic districts. For the purpose of evaluating the motion for class certification, the District Court permitted discovery from five of these districts, including "the Laurel Mountain district directly implicated by the individual named plaintiffs' allegations." *Hohider v. UPS*, 243 F.R.D. 147, 156 (W.D.Pa.2007).

**3.** Hohider began at UPS in 1986 as a part-time loader/unloader, and worked part-time in various positions at UPS in the subsequent years, including as a loader, a sorter, and a package-car driver. In 1999, a vehicle he was operating at work was struck from behind, resulting in an injury to his back later diagnosed to be disc herniation with left leg radiculopathy. UPS hired DiPaolo in 1972 as a part-time loader/unloader, and he became a full-time package-car driver in 1978. He suffered a workplace injury in 1997 and developed reflex sympathetic dystrophy, a neurological disorder. Branum started working as a mechanic at UPS in 1981. He suffered a neck injury on the job which required surgery in November 2004. *See Hohider*, 243 F.R.D. at 229–30.

jobs, as a pretext to prevent disabled employees from holding any UPS job; (4) prohibit[s] employees from returning to work in an alternative job within the employees' restrictions and prevent[s] employees from using union seniority rights to transfer to a position that accommodates their disabilities;

(5) withdraw[s] accommodations previously provided to disabled workers, and then den[ies] requests for the previously provided accommodations; and

(6) treat[s] persons who make requests for accommodations differently and less favorably in the terms, conditions, rights and privileges, of or incident to, their employment as a result of engaging in this protected act under the ADA.

*Hohider v. UPS,* 243 F.R.D. 147, 153 (W.D.Pa.2007) (citing Pls.' Br. Supp. Mot. Class Certification 3–4). These policies of non-accommodation, plaintiffs contend, constitute patterns and practices of intentional discrimination prohibited under the ADA.

Plaintiffs asked the District Court to certify a nationwide class [4] with respect to these claims, and sought various forms of classwide relief, including injunctive and declaratory relief, back pay, and compensatory and punitive damages. Plaintiffs proposed the following class definition for certification:

Those persons throughout the United States who: (i) according to the records of UPS, its agents and contractors have been employed by UPS at any time since May 10, 2000, including those employees absent from work and receiving either workers' compensation or short or long term disability insurance benefits; and (ii) have been absent from work because of a medical impairment; and (iii) are disabled as defined under the Americans with Disabilities Act (ADA); and (iv) have attempted to return to work or continue to work at UPS or have submitted to UPS a medical release that permits the employee to work with restrictions and conditions, or have been disqualified by UPS from returning to work; and (v) were harmed as a result of UPS's policies, practices and procedures that control reentry into the workplace or otherwise govern the making of reasonable accommodations under Title I of the ADA to employees in UPS's workforce.

Excluded from the Class are all presently working UPS management employees with supervisory authority over the formulation or implementation of the UPS policies and practices alleged in this action to violate the ADA.

*Id.* at 154 (citing Pls.' Br. Supp. Mot. Class Certification 4–5).

The District Court analyzed plaintiffs' motion for class certification under Fed. R.Civ.P. 23(a) and (b)(2).[5] The court premised its analysis on a two-stage evidentiary framework that the Supreme Court has promulgated for adjudicating pattern-or-practice claims of discrimina-

---

**4.** Based on the discovery performed in UPS's five sample districts, "plaintiffs extrapolated ... that there are potentially 36,290 class members, although there could be more or less than that number." *Hohider,* 243 F.R.D. at 213.

**5.** According to their original complaint, plaintiffs Hohider and DiPaolo "br[ought] this action as a class action pursuant to Rule 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of

Civil Procedure." Hohider & DiPaolo Compl. ¶ 19. The District Court found, however, that "[s]ubsequent filings with the court, and in particular plaintiffs' briefing in support of their motion for class certification, ... indicate that plaintiffs seek certification solely under Rule 23(a) and Rule 23(b)(2)." *Hohider,* 243 F.R.D. at 233; *see* Pls.' Br. Supp. Mot. Class Certification 4, 39.

tion under Title VII of the Civil Rights Act of 1964, discussed in greater detail *infra*. Applying this framework to plaintiffs' ADA claims, the court found three of them satisfied the requirements of Rule 23(a) and (b)(2). Accordingly, the court certified those claims for class treatment, and modified plaintiffs' proposed class definition to incorporate them. The court also removed from the proposed class definition the requirement that class members be "disabled as defined under the [ADA]" and "harmed as a result of UPS's policies, practices and procedures that control reentry into the workplace or otherwise govern the making of reasonable accommodations under Title I of the ADA to employees in UPS's workforce." According to the court, "[t]his exclusion would make determining membership in the class less problematic by removing the criteria which require what are arguably legal conclusions and may entail individualized inquiries," *Hohider*, 243 F.R.D. at 209, and would place the "focus on the alleged conduct at issue rather than the ease of identifying the class members prior to deter-

minations of liability," which it considered most fitting for the broad injunctive relief sought under Rule 23(b)(2). *Id.* at 210. The court approved for certification the following modified class definition:

Those persons throughout the United States who:

(i) according to the records of UPS, its agents and contractors, have been employed by UPS at any time since May 10, 2000, including those employees who were absent from work and were receiving either workers' compensation or short or long term disability insurance benefits; and

(ii) have been absent from work because of medical reasons; and

(iii)(A) did not return to work by reason of UPS's alleged 100% healed policy; or

(B) did not return to work by reason of UPS's allegedly discriminatory implementation of its formal ADA compliance policy; or

(C) did not return to work by reason of the allegedly discriminatory use by UPS of uniform pretextual job descriptions.[6]

**6.** The District Court detailed the factual background of the discriminatory policies alleged in the three claims certified for class treatment. *See Hohider*, 243 F.R.D. at 166–85. We will not replicate that effort here, but offer a brief summary of those policies to provide context for our analysis on appeal. As noted, plaintiffs allege UPS has an unofficial, companywide "100% healed" policy, under which "UPS systematically requires employees attempting to return from medical leave to present a full medical release—one without any permanent restriction—certifying that the employee is able to perform the 'essential functions' of the employee's last job before allowing them to return to work in any capacity at UPS." Pls.' Br. 4. UPS has in place an official, written ADA compliance procedure, which outlines a ten-step process whereby employees with impairments can interact with various management personnel at UPS to determine whether their conditions can be reasonably accommodated. Plaintiffs allege, however, that "[t]his so-called 'ten-step ac-

commodation process' is the embodiment of bad faith and discriminatory intent," as it "unquestionably is intended, designed and administered only to unnecessarily delay and prevent the provision of reasonable accommodations as the usual practice, while creating a false record of procedural compliance with the ADA" and reinforcing UPS's actual, unlawfully discriminatory policy that only employees "100% healed" may return to work at UPS. Pls.' Br. Supp. Mot. Class Certification 3, 15.

Plaintiffs also allege UPS's official job descriptions include extraneous and excessively demanding physical requirements, which are designed to foreclose impaired employees from qualifying for employment in any position at UPS. For example, plaintiffs contend almost every job description at UPS lists a seventy-pound lifting requirement as an "essential function" of the position, even though many of the positions would rarely, if ever, require such ability. *See id.* at 27; *see also id.*

Excluded from the Class are all presently working UPS management employees with supervisory authority over the formulation or implementation of the UPS policies and practices alleged in this action to violate the ADA.

*Id.* at 246. As to relief, the court determined plaintiffs' claims for compensatory and punitive damages could not be certified for classwide treatment under Rule 23(b)(2), but it withheld judgment on plaintiffs' back-pay claims, concluding that "[p]laintiffs ... may be able to seek back pay or other equitable relief for individual class members if there is a protocol for identifying those monetary damages which sets forth the objective standards to be utilized in determining the amount of those damages in a way that does not require additional hearings on individualized circumstances." *Id.* at 245. The court also noted that, having certified the class, it would revisit at a subsequent status conference with the parties the issue of bifurcating the proceedings in accordance with the two-stage evidentiary framework mentioned *supra* (having previously denied without prejudice plaintiffs' motion for bi-

furcation, subject to the court's decision on class certification). *Id.* at 244–45. UPS petitioned for permission to appeal the grant of certification under Fed.R.Civ.P. 23(f), which we granted.

## II.

We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(e) and Fed.R.Civ.P. 23(f). "We review a class certification order for abuse of discretion, which occurs if the district court's decision 'rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.'" *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir.2008) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith*, 259 F.3d 154, 165 (3d Cir.2001)). "[W]hether an incorrect legal standard has been used is an issue of law to be reviewed *de novo.*" *Id.* (alteration in original) (internal quotation marks omitted).

 "Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met."[7] *Id.* at 309 (quoting

("This 70–pound lifting requirement is even claimed by UPS to be an essential function of management jobs although the collective bargaining agreement prohibits management from doing this jealously-guarded 'union work.'"). It is not clear whether there are other aspects of UPS's job descriptions in addition to this lifting requirement that plaintiffs consider pretextual and discriminatory. Furthermore, though the District Court certified this claim regarding UPS's use of pretextual job descriptions, it expressed uncertainty in its certification analysis over whether the allegation was intended to assert an independent violation of the ADA, or only to provide evidentiary support for plaintiffs' other claims. *See Hohider*, 243 F.R.D. at 221 n. 87 (noting that "[i]f this claim otherwise satisfies Rule 23, plaintiffs will need to refine whether they are challenging the use of these job descriptions as alternative violations of the ADA or relying on this policy as evidentiary sup-

port for the challenge to UPS's overall formal ADA compliance policy").

7. As we recently noted,

[c]lass certification under Rule 23 has two primary components. The party seeking class certification must first establish the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy]." Fed. R.Civ.P. 23(a). If all four requirements of Rule 23(a) are met, a class of one of three types (each with additional requirements) may be certified. *See* Fed.R.Civ.P. 23(b)(1)-(3).

*Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). "Because the decision whether to certify a class 'requires a thorough examination of the factual and legal allegations,' the court's rigorous analysis may include a 'preliminary inquiry into the merits,' and the court may 'consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.'" *Id.* at 317 (citations omitted) (quoting *Newton,* 259 F.3d at 166, 168); *see also id.* at 319 ("A critical need is to determine how the case will be tried." (quoting Fed.R.Civ.P. 23 advisory committee's note, 2003 Amendments)). "A district court that premises its legal analysis on an erroneous understanding of the governing law has abused its discretion." *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,* 487 F.3d 261, 264 (5th Cir. 2007).

As noted, the District Court certified for classwide treatment plaintiffs' claims regarding "UPS's alleged 100% healed policy," "UPS's allegedly discriminatory implementation of its formal ADA compliance policy," and "the allegedly discriminatory use by UPS of uniform pretextual job descriptions." *Hohider,* 243 F.R.D. at 246. The court concluded that, "with respect to [these three] class claims, plaintiffs may seek appropriate equitable relief including injunctive and declaratory relief and monetary damages incidental to the requested injunctive or declaratory relief." *Id.* at 245. UPS raises numerous challenges to this grant of certification, many of which stem from its contention that adjudication of plaintiffs' claims requires the court to assess whether the named plaintiffs and the class members are "qualified individuals with disabilities," as defined under the ADA. This assessment, according to UPS, would entail too many individualized inquiries for class treatment to be warranted.

The District Court recognized that inquiries necessary to the "qualified individual with a disability" assessment could not be adjudicated with respect to this class in a manner consistent with Rule 23(a) and (b)(2), but found these inquiries did not preclude certification of the claims and relief specified above. Central to this conclusion was the court's determination that these claims could be tried under the *"Teamsters* framework," a two-stage method of proof promulgated by the Supreme Court for adjudicating pattern-or-practice claims brought under Title VII of the Civil Rights Act of 1964: according to the court, "whether plaintiffs can proceed under the *Teamsters* pattern-or-practice framework is key to the decision whether class certification is appropriate in this case because it bears directly on the elements of the prima facie case that plaintiffs will have to prove at the liability stage of this litigation." *Id.* at 192. Relying on the *Teamsters* framework as it has been applied in the Title VII context, the District Court found it could determine whether UPS engaged in a pattern or practice of unlawful discrimination, as contemplated at the "liability" stage of that framework, without evaluating whether plaintiffs and class members were "qualified" under the ADA. Accordingly, the court concluded it need not consider this "qualified" standard, and the individualized inquiries it would entail with respect to the proposed class, in deciding whether the "liability" stage of plaintiffs' claims could be certified. As we

*In re Hydrogen Peroxide,* 552 F.3d at 309–10 n. 6. This class has been certified under Rule 23(b)(2), which applies to class actions where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R.Civ.P. 23(b)(2).

discuss, however, in this case it is not possible to reach a classwide determination of unlawful discrimination without undertaking analysis of qualification, as it is defined by the ADA. Contrary to the District Court's conclusion, adopting the *Teamsters* method of proof to adjudicate plaintiffs' claims does not obviate the need to consider the ADA's statutory elements. We believe this error in identifying the legal standard controlling plaintiffs' claims resulted in an improper grant of class certification.

### III.

### A.

■ At the outset, a brief review of the origins of the *Teamsters* framework is in order. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), presented an employment discrimination suit brought by the United States under § 707(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6(a).[8] The government alleged the employer engaged in a pattern or practice of employment discrimination prohibited under Title VII. *Teamsters*, 431 U.S. at 329, 97 S.Ct. 1843. In analyzing this claim, the Supreme Court rejected the employer's argument that "the Government's burden of proof in a pattern-or-practice case must be equivalent to that outlined in *McDonnell Douglas v. Green*."[9] *Id.* at 357, 97 S.Ct. 1843. Noting that "[o]ur decision in [*McDonnell Douglas*] . . . did not purport to create an inflexible formulation" for analyzing claims of discrimination under Title VII, the Court looked to its previous decision in *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), which addressed a class-action pattern-or-practice claim of race discrimination under Title VII. *Teamsters*, 431 U.S.

---

8. Section 707(a) provides:

 Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

 42 U.S.C. § 2000e–6(a). As noted in *Teamsters*, § 707 has been amended "to give the Equal Employment Opportunity Commission, rather than the Attorney General, the authority to bring 'pattern or practice' suits under

that section against private-sector employers." 431 U.S. at 329 n. 1, 97 S.Ct. 1843.

9. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court found that

 [t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

 *Id.* at 802, 93 S.Ct. 1817. Once this prima facie case has been made, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* The complainant would then "be afforded a fair opportunity to show that [the employer's] stated reason for [the complainant's] rejection was in fact pretext." *Id.* at 804, 93 S.Ct. 1817.

at 358–59, 97 S.Ct. 1843. Drawing on the method of proof it used in *Franks* to adjudicate the class's claims, the Court promulgated a two-stage framework for analyzing Title VII pattern-or-practice suits. It defined the first stage as follows:

> The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. At the initial, "liability" stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant. . . .
>
> If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief. Such relief might take the form of an injunctive order against continuation of the discriminatory practice, an order that the employer keep records of its future employment decisions and file periodic reports with the court, or any other order "necessary to ensure the full enjoyment of the rights" protected by Title VII.

*Id.* at 360–61, 97 S.Ct. 1843 (citation omitted). To establish liability for a pattern or practice of unlawful discrimination, "the Government ultimately ha[s] to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It ha[s] to establish by a preponderance of the evidence that [the alleged] discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* at 336, 97 S.Ct. 1843. The Court emphasized that "at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking. While a pattern might be demonstrated by examining the discrete decisions of which it is composed, the Government's suits have more commonly involved proof of the expected result of a regularly followed discriminatory policy." *Id.* at 360–61 n. 46, 97 S.Ct. 1843.

The second, "remedial" stage of the *Teamsters* framework pertains to individual relief, and is reached only after liability is established in the first stage of analysis:

> When the Government seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief. . . . [T]he question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage of the trial. The employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decisionmaking.
>
> The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The Government need only

show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination. As in *Franks*, the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.

*Id.* at 361–62, 97 S.Ct. 1843 (footnote omitted).[10] According to the Court, this inference of discrimination in favor of the individual employee at the second stage of proceedings is an appropriate consequence of the liability determination at the first *Teamsters* stage because, inter alia, "the finding of a pattern or practice [of unlawful discrimination] change[s] the position of the employer to that of a proved wrongdoer." *Id.* at 359–60 n. 45, 97 S.Ct. 1843.

■ In *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984), the Court noted that "[a]lthough *Teamsters* involved an action litigated on the merits by the Government as plaintiff under § 707(a) of [the Civil Rights Act of 1964], it is plain that the elements of a prima facie pattern-or-practice case are the same in a private class action." *Id.* at 876 n. 9, 104 S.Ct. 2794. The *Cooper* Court observed that, under this two-stage framework, "[w]hile a finding of a pattern or practice of discrimination itself justifies an award of prospective relief to the class, additional proceedings are ordinarily required to determine the scope of individual relief for the members of the class." *Id.* at 876, 104 S.Ct. 2794 (citing *Teamsters*, 431 U.S. at 361, 97 S.Ct. 1843). The Court elaborated on the distinction between an individual claim of discrimination adjudicated under the *McDonnell Douglas* framework, where the focus is on uncovering "the reason for a particular employment decision," and a class-based pattern-or-practice claim under the *Teamsters* framework, which focuses at the "liability" stage not " 'on individual hiring decisions, but on a pattern of discriminatory decisionmaking.' " *Id.* (quoting *Teamsters*, 431 U.S. at 360 n. 46, 97 S.Ct. 1843). Thus, in the class context, "the existence of a valid individual claim does not necessarily warrant the conclusion that the individual plaintiff may successfully maintain a class action," just as "a class plaintiff's attempt to prove the existence of a companywide policy ... may fail even though discrimination against one or two individuals has been proved." *Id.* at 877–78, 104 S.Ct. 2794 (drawing on *Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740).[11]

**10.** If the employer offers a nondiscriminatory justification for its conduct, that justification "will be subject to further evidence by the Government that the purported reason for an applicant's rejection was in fact a pretext for unlawful discrimination." *Teamsters*, 431 U.S. at 362 n. 50, 97 S.Ct. 1843 (citing *McDonnell Douglas*, 411 U.S. at 804–06, 93 S.Ct. 1817).

**11.** Since *Cooper*, courts of appeals have used the *Teamsters* two-stage framework to analyze pattern-or-practice claims brought as private-plaintiff class actions under Title VII, *see, e.g., Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 158–60 (2d Cir.2001); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 409 (5th Cir.1998), as well as under other statutes such as the Employee Retirement Income Security Act, *see Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 852–65 (3d Cir.1987).

No court of appeals has addressed directly if and how this framework might apply to a private-plaintiff pattern-or-practice class action under the ADA, though some have touched upon the issue in passing. In *Bates v. UPS*, 511 F.3d 974 (9th Cir.2007) (en banc), the Court of Appeals for the Ninth Circuit reviewed a district court's treatment of an ADA private-plaintiff class action under the *Teamsters* pattern-or-practice framework. The Ninth Circuit concluded that applying *Teamsters* in that case was unnecessary, because "[t]he fact to be uncovered by such a [burden-shifting] protocol—whether the employer made an employment decision on a

### B.

The District Court reviewed the *Franks*, *Teamsters*, and *Cooper* decisions, and concluded their framework for analyzing a Title VII pattern-or-practice claim is properly applied to a private-plaintiff class action brought under the ADA. According to the court, "[t]his result is compelled by the Supreme Court's decisions [in those three cases] and because the ADA incorporates the remedies afforded to plaintiffs litigating claims pursuant to Title VII." [12] *Hohider*, 243 F.R.D. at 208. The court found "no legal authority supporting a categorical prohibition against litigating ADA claims pursuant to a Rule 23(b)(2) class action utilizing [the *Teamsters*] framework." *Id.* at 205. It reviewed the sparse appellate case law that has touched upon this issue and concluded those cases supported, or were at least consistent with, the application of this framework to plaintiffs' claims. Accordingly, the court adopted the *Teamsters* framework, and proposed the following method for its application to the class:

> Plaintiffs . . . will be allowed to litigate their pattern-or-practice claims for injunctive relief pursuant to the elements of a prima facie case set forth in *Teamsters* and will not be required to make out the elements for an individual ADA claim if some or all of their claims are certified for declaratory and injunctive relief. Here, plaintiffs to establish a prima facie case of a pattern or practice that is discriminatory under the ADA must show at the initial liability stage that such a policy existed—not that each person for whom they are seeking relief was a victim of the allegedly discriminatory policy. If plaintiffs do so, the bur-

proscribed basis (here, disability in the form of hearing impairment)—[wa]s not in dispute." *Id.* at 988. Thus, while the Ninth Circuit declined to apply *Teamsters*, it did not disavow it as an appropriate framework to apply when the existence of the alleged discriminatory policy is in question, as it is here.

In *Davoll v. Webb*, 194 F.3d 1116 (10th Cir.1999), the Court of Appeals for the Tenth Circuit affirmed the district court's decision to permit the government to go forward with an ADA pattern-or-practice claim under the *Teamsters* framework, stating that *"Teamsters* sets forth a logical and efficient framework for allocating burdens of proof in pattern and practice employment discrimination suits, and we approve of the district court's use of that framework in this case." *Id.* at 1148. The Tenth Circuit also affirmed the district court's denial of certification to the private class of plaintiffs seeking to bring the same substantive claims as the government. The district court had found that determining whether class members were "disabled" under the ADA would require " 'necessarily individualized inquiries' [that] are best suited to a case-by-case determination" and that rendered the class uncertifiable. *Davoll v. Webb*, 160 F.R.D. 142, 146 (D.Colo.1995) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1396 (5th Cir.1993)). The Tenth Circuit noted that,

unlike the plaintiffs' class suit, "a pattern and practice action brought by the United States pursuant to section 707 of Title VII, 42 U.S.C. § 2000e–6, is not subject to the requirements of Fed.R.Civ.P. 23." *Davoll*, 194 F.3d at 1147 n. 20 (citing *Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 327 & n. 9, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)). Nonetheless, the court also noted that "[w]e understand plaintiffs' concern that by denying their class certification motion and upholding the United States pattern and practice action, this decision may be interpreted as holding that only the government can bring a class-wide ADA employment suit. Such an interpretation would be unfounded." *Id.* at 1146 n. 20.

12. The ADA incorporates by reference 42 U.S.C. § 2000e–6(a), the provision, noted *supra*, that authorizes the government to bring pattern-or-practice suits under Title VII. *See* ADA, 42 U.S.C. § 12117(a) ("The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter. . . .").

den then shifts to defendant to defeat this prima facie case. If defendant fails to rebut this prima facie case that a discriminatory policy existed, broad-based prospective injunctive or declaratory relief may be warranted. If plaintiffs are permitted to seek individual relief, the court may need to conduct additional proceedings with respect to the scope of individual relief.

*Id.* at 208 (footnote omitted). The court found that, "under the pattern-or-practice framework, at the initial liability stage, plaintiffs need not prove that each member of the class was a qualified individual with a disability or individually entitled to reasonable accommodation." *Id.* at 229. Rather, "the individual elements of a reasonable accommodation claim may be relevant at the second, remedial stage of proceedings if plaintiffs seek individual relief on behalf of individual class members." [13] *Id.* at 208 n. 69; *see also id.* at 200 (suggesting inquiries into whether class members are qualified, including whether they can or need to be reasonably accommodated, would occur at the second *Teamsters* stage).[14]

---

**13.** The District Court did not make clear whether this second *Teamsters* stage would occur with respect to this class, and if so, how it would proceed. Analogizing to *Teamsters,* the court did note that a finding of liability at the first stage would result in the following burdens and presumptions for each party during whatever individual-relief proceedings may follow:

> If plaintiffs in this case seek individual relief for class members in this class action . . . who can show they attempted to return to work with or without an accommodation and if there is a finding of liability, those individuals arguably will be entitled to a presumption, which UPS can rebut, that they have been discriminated against. The burden will be on UPS to show that those individuals are not entitled to individual relief; for example, by demonstrating that an individual could not perform a job even with an accommodation. On the other hand, with respect to . . . those employees who were absent from work due to medical reasons and did not attempt to return to work or otherwise seek an accommodation, the burden arguably will be on the individual to show that he or she was capable of working with or without an accommodation and that he or she would have attempted to return to work. . . . It is not clear at this time whether the class was intended to not only include individuals who in fact attempted to return to work, but also to include those employees who did not attempt to return to work. At the remedial stage in the proceedings if it has been determined that UPS has a discriminatory policy in violation of the ADA, the parties will need to brief whether those who did not attempt to return to work are akin to nonapplicants as contemplated by *Teamsters* and should be included as members of the class. In other words, it will need to be determined whether the "applicant" versus "nonapplicant" distinction is actually implicated in this case.

*Hohider,* 243 F.R.D. at 200.

**14.** At certain points in its analysis, the District Court suggested that whether plaintiffs were "qualified" under the ADA may be relevant to its certification determination. *See, e.g., Hohider,* 243 F.R.D. at 206 ("*Bates* is instructive for this case . . . to the extent that it is an example of a private-plaintiff Rule 23(b)(2) ADA class action and to the extent that it recognized that, in such cases, to maintain a class action, the named plaintiffs needed to establish that at least one named plaintiff was 'qualified' in order to have statutory standing to bring a lawsuit under the ADA." (footnote omitted)); *id.* at 229 (recognizing that "[s]ome courts . . . have required named plaintiffs—at least in order to have standing to assert an ADA claim alleging an illegal policy and to represent the class adequately—to establish that they are qualified individuals within the meaning of the ADA at the certification stage"). The court, however, does not appear to have undertaken the inquiry. *See id.* at 218 n. 82 (declining to address whether plaintiffs are "qualified" in its Rule 23(a) commonality discussion, because "[a]t the class certification stage, this issue really goes to the named plaintiffs' typicality and adequacy to represent the class and to the appropriateness of individual re-

The court recognized that, in the present case, some of these "individual elements of a reasonable accommodation claim" are not suitable for class treatment, as their resolution would require inquiries too individualized and divergent with respect to this class to meet the requirements of Rule 23. *See id.* at 191 (noting "th[e] issue 'whether a reasonable accommodation is possible' cuts against certification under the Rule 23(a) prerequisites of commonality and typicality as well as the Rule 23(b)(2) requirement that the defendant treated the proposed class members on grounds generally applicable to the class"). By the court's analysis, however, these individualized inquiries could be delayed until the second, "remedial" stage of the *Teamsters* framework, and thus would not obstruct certification of the first, "liability" stage, which would require only proof of the existence of the alleged policies as UPS's "standard operating procedure." *See, e.g., id.* at 231 ("It is sufficient in order to certify a class pursuant to Rule 23(b)(2) for the court to find that either UPS has acted on grounds generally applicable to the class by *engaging* in the alleged de facto 100% healed policy or by *not engaging* in the alleged de facto 100% healed policy; by implementing its formal ADA compliance procedures *in violation of the ADA,* or by implementing them *in compliance with it;* or by creating job classifications that are designed *without regard to essential job functions* to preclude anyone from returning to work who could not lift seventy pounds, or by creating job classifications that are designed *with regard to essential job func-*

*tions.*"). Accordingly, the court identified which of plaintiffs' claims were premised on policies whose existence could be proven on a classwide basis, *see, e.g., id.* at 222–23, and certified the class to pursue nonindividualized relief with respect to those claims. *See id.* at 245 ("[W]ith respect to the class claims, plaintiffs may seek appropriate equitable relief including injunctive and declaratory relief and monetary damages incidental to the requested injunctive or declaratory relief. Plaintiffs, therefore, may be able to seek back pay or other equitable relief for individual class members if there is a protocol for identifying those monetary damages which sets forth the objective standards to be utilized in determining the amount of those damages in a way that does not require additional hearings on individualized circumstances.").

## C.

■ The parties dispute whether the *Teamsters* evidentiary framework is properly applied to the present case. This dispute comprises two inquiries: whether the *Teamsters* framework, as a general matter, can be imported from the Title VII context in which it was promulgated and applied to pattern-or-practice claims raised under the ADA; and if so, whether plaintiffs' claims, when analyzed with this framework in mind, can be certified for class treatment.

If we assume, as plaintiffs contend and the District Court found, that in light of 42 U.S.C. § 12117(a) and Title VII jurispru-

---

lief" and thus "will be addressed in more detail" later in the analysis); *id.* at 226 (declining to address "[t]he question whether plaintiffs are qualified individuals under the ADA" in its typicality discussion, as that question "more directly affects plaintiffs' adequacy as class representatives"); *id.* at 229–30 (reciting, in its Rule 23(a) adequacy-of-repre-

sentation discussion, evidence regarding plaintiffs' status as "disabled" under the ADA and finding, without discussion of plaintiffs' status as "qualified," "that the evidence is sufficient for the court to determine for the purposes of certification that plaintiffs are adequate to bring this lawsuit and have statutory standing to sue under the ADA").

dence, the *Teamsters* framework can be used to analyze pattern-or-practice claims brought as private-plaintiff class actions under the ADA, this does not, in itself, resolve whether the class action before us can go forward under the *Teamsters* framework in a manner consistent with Rule 23. The *Teamsters* framework was judicially promulgated as a method of proof for pattern-or-practice claims brought by the government under Title VII, as that statute authorizes—it provides a means by which courts can assess whether a particular form of statutorily prohibited discrimination exists, just as the *McDonnell Douglas* framework does for individual claims of disparate treatment. And, like the *McDonnell Douglas* framework, its importance "lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Teamsters,* 431 U.S. at 358, 97 S.Ct. 1843; *see Bates v. UPS,* 511 F.3d 974, 988 (9th Cir.2007) (en banc) (finding that the "burden-shifting protocol [of *Teamsters*] is ... unnecessary" when "[t]he fact to be uncovered by such a protocol—whether the employer made an employment decision on a proscribed basis ...—is not in dispute," and noting that the protocol, when used to resolve this fact, becomes "moot after trial" and does not substantively bear on a reviewing court's assessment of "whether the evidence presented at trial supports a finding of liability"); *see also, e.g., U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("The prima facie case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff." (internal quotation marks and citations omitted)); *Dillon v. Coles,* 746 F.2d 998, 1003 (3d Cir.1984) ("The *McDonnell Douglas* formula is a tool that enables the trial judge to sift through the evidence in an orderly fashion to determine the ultimate question in the case—did the defendant intentionally discriminate against the plaintiff. The presumptions and the shifting burdens are merely an aid in making that determination; they are not ends in themselves." (citation omitted)).

Thus, the *Teamsters* framework might assist a court's analysis of whether a defendant has engaged in a pattern or practice of discrimination prohibited under Title VII and, if so, to whom relief should be awarded. It is Title VII, however, that defines the scope of prohibited discrimination and sets the substantive boundaries within which the method of proof must operate. So too with the ADA. Even if the *Teamsters* framework is recognized as an acceptable method of proof for pattern-or-practice claims under the ADA, this determination would not, by its own force, affect what patterns or practices constitute discrimination prohibited by the statute. Nor would the framework, once adopted, independently dictate what substantive elements must meet the requirements of Rule 23 in order to reach a classwide finding of unlawful discrimination under that statute.

Here, the District Court adopted the *Teamsters* framework to analyze plaintiffs'

ADA claims, and concluded it could certify three of those claims for class treatment under the first, "liability" stage of that framework. *See Hohider,* 243 F.R.D. at 208, 245. The court determined that, if plaintiffs are able to prove the existence of the policies alleged in those claims as UPS's "standard operating procedure," such proof, with nothing more, would be sufficient to establish that UPS engaged in a classwide pattern or practice of discrimination prohibited under the ADA. *See, e.g., id.* at 231–32. The court found that the individualized inquiries with respect to the class could be delayed until the second *Teamsters* stage of proceedings, which is devoted to questions of individual relief, and would be unnecessary to the determinations made at the first *Teamsters* stage. *See id.* at 229, 208 n. 69 ("[U]nder the pattern-or-practice framework, at the initial liability stage, plaintiffs need not prove that each member of the class was a qualified individual with a disability or individually entitled to reasonable accommodation," though "the individual elements of a reasonable accommodation claim may be relevant at the second, remedial stage of proceedings if plaintiffs seek individual relief on behalf of individual class members."). By the court's analysis, because the existence of the policies can be adjudicated on a classwide basis and plaintiffs need not prove anything else to reach, at the first *Teamsters* stage, a finding of liability and relief with respect to the class, the claims alleging discrimination as a result of these policies may be certified under Rule 23(a) and (b)(2).

The *Teamsters* framework alone, however, does not justify this conclusion. Under this framework, plaintiffs would have the burden of proving that UPS has adopted, as its "standard operating procedure," a pattern or practice of discrimination prohibited under the ADA, *see Teamsters,* 431 U.S. at 336, 97 S.Ct. 1843, and, if they

carry this burden, the class would be entitled to a finding of liability and relief. *See id.* at 361, 97 S.Ct. 1843 ("Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief."); *Cooper,* 467 U.S. at 876, 104 S.Ct. 2794. The focus at this first stage of proof is generally not "on individual hiring decisions, but on a pattern of discriminatory decisionmaking," *Teamsters,* 431 U.S. at 360 n. 46, 97 S.Ct. 1843, and "the question of individual relief does not arise until [the second *Teamsters* stage, after] it has been proved [at the first stage] that the employer has followed an employment policy of unlawful discrimination." *Id.* at 361, 97 S.Ct. 1843; *see Cooper,* 467 U.S. at 876, 104 S.Ct. 2794.

That the existence of the policies alleged by plaintiffs can be adjudicated on a classwide basis, however, does not mean that these policies, if proven to exist, would amount to a classwide showing of unlawful discrimination under the ADA. And that the *Teamsters* framework contemplates a second stage of proceedings where questions of individual relief may be addressed, does not mean that all individualized inquiries with respect to a given class can be delayed until that stage. Instead, it is necessary to look to the ADA, the statutory basis for plaintiffs' claims, to assess what elements must be demonstrated for the court to reach, at the first *Teamsters* stage, a determination of unlawful discrimination and a finding of classwide liability and relief. If those elements include individualized inquiries that cannot be addressed in a manner consistent with Rule 23, then the class cannot be certified. As noted in *Cooper,* the elements necessary to establish a pattern or practice of unlawful discrimination on behalf of a class may not mirror those necessary to establish a valid individual claim of discrimination, *see* 467

U.S. at 877–78, 104 S.Ct. 2794, and so the fact that individualized inquiries might preclude certification of class members' various individual claims of relief is not necessarily dispositive of whether that class's pattern-or-practice claim satisfies Rule 23. It is the ADA, however, and not the *Teamsters* evidentiary framework, that controls the substantive assessment of what elements must be determined to prove a pattern or practice of unlawful discrimination in this case. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2512, 168 L.Ed.2d 179 (2007) ("Congress, as creator of federal statutory claims, ... has power to determine what must be proved to prevail on the merits."); *cf. Gross v. FBL Fin. Servs., Inc.,* 129 S.Ct. 2343, 2350 n.3, 174 L.Ed.2d 119 (2009) (noting that, in "decid[ing] whether [the Age Discrimination in Employment Act of 1967 (ADEA)] authorizes a mixed-motives age discrimination claim," "[o]ur inquiry ... must focus on the text of the ADEA," and rejecting the notion that the Court may recognize such a claim merely because it may believe "there is 'nothing unfair or impractical' about hinging liability on whether 'forbidden motive ... play[ed] a role in the employer's decision,' " as "that is a decision for Congress to make" and "[w]e must give effect to Congress' choice" (quoting *id.,* at 2350 (Breyer, J., dissenting))). We believe the District Court's certification analysis loses sight of this point. *See, e.g., Hohider,* 243 F.R.D. at 155 ("The court ultimately concludes ... that ... plaintiffs' claims are subject to the [*Teamsters*] pattern-or-practice framework of proof ..., which does not require an individualized inquiry at the liability stage adjudicating whether a company-wide policy is unlawful under the discrimination statutes ...."); *id.* at 208 ("[T]his court concludes that plaintiffs in this case are not barred from proceeding pursuant to the pattern-or-practice frame-

work set forth in *Teamsters* because they are private plaintiffs or because they are litigating claims pursuant to the ADA and not Title VII. Plaintiffs, therefore, will be allowed to litigate their pattern-or-practice claims for injunctive relief pursuant to the elements of a prima facie case set forth in *Teamsters* and will not be required to make out the elements for an individual ADA claim if some or all of their claims are certified for declaratory and injunctive relief."); *id.* at 226 n. 91 ("Defendant's arguments that individualized issues predominate and each named plaintiff's claim implicates unique defenses fail in light of the court's finding that plaintiffs can litigate these claims challenging alleged company-wide policies pursuant to the [*Teamsters*] pattern-or-practice framework."). To the extent the District Court relied upon the *Teamsters* method of proof to reach a certification decision incompatible with the substantive requirements of the ADA, it abused its discretion. *See Oscar Private Equity,* 487 F.3d at 264 ("A district court that premises its legal analysis on an erroneous understanding of the governing law has abused its discretion."); *see also* Rules Enabling Act, 28 U.S.C. § 2072(b) (prohibiting the use of federal rules of practice and procedure, including the class action mechanism provided for by Rule 23, to "abridge, enlarge or modify any substantive right"); *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 845, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 612–13, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

## IV.

■ Having reviewed plaintiffs' claims in light of the substantive requirements of the ADA, we find those claims cannot be adjudicated within the parameters of Rule 23 such that a determination of classwide liability and relief can be reached. Rath-

er, establishing the unlawful discrimination alleged by plaintiffs would require determining whether class members are "qualified" under the ADA, an assessment that encompasses inquiries acknowledged by the District Court to be too individualized and divergent with respect to this class to warrant certification under Rule 23(a) and (b)(2). Contrary to the court's determination otherwise, the *Teamsters* framework cannot, by its own force, cure this flaw in the class. Accordingly, the court's grant of class certification was an abuse of discretion.

### A.

Title I of the ADA provides, as a general rule, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

Title I enumerates specific examples of conduct that would constitute discrimination prohibited under the statute. *See id.* § 12112(b). The three class claims that have been certified, according to the District Court, all "implicate the [ADA's] prohibition against discrimination in the form of failure to make reasonable accommodations." *Hohider*, 243 F.R.D. at 187. Namely, the ADA specifies that one way a covered entity can engage in unlawful discrimination under the statute is by

> (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(5)(A)-(B).[15]

In construing § 12112(b)(5), we have held that, for a covered entity to be found liable for discrimination on the basis of failure to accommodate, the plaintiff must prove " '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination' ... [which] in this context include[s] refusing to make reasonable accommodations for a plaintiff's disabilities." *Williams v. Phila. Housing Auth. Police*

---

**15.** As the District Court noted, plaintiffs "characterize each of their reasonable accommodation policies claims as pattern-or-practice variants of a 'failure to make a reasonable accommodation' claim that an individual plaintiff could bring under the ADA in an individual lawsuit. These claims challenge UPS's alleged company-wide policies of non-accommodation in violation of the ADA." *Hohider*, 243 F.R.D. at 154. The court did not address whether these claims can be understood as falling under another discrimination provision under the ADA and, on appeal, the parties do not dispute this characterization of the claims.

*Dep't*, 380 F.3d 751, 761 (3d Cir.2004) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999)). We have also recognized that, although the ADA itself does not mention an "interactive process" with respect to reasonable accommodations,

> [t]he ADA's regulations state that: "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o* )(3). Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9 at 359.

*Taylor*, 184 F.3d at 311 (alterations in original omitted); *see Williams*, 380 F.3d at 771. In handling a disabled employee's request for a reasonable accommodation, "both parties [employers and employees] have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." *Taylor*, 184 F.3d at 312 (quoting *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir.1997)). "The interactive process does not dictate that any par-

ticular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions. All the interactive process requires is that employers make a good-faith effort to seek accommodations." *Id.* at 317 (citation omitted). Accordingly, we have found that

> [a]n employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith."

*Williams*, 380 F.3d at 772 (quoting *Taylor*, 184 F.3d at 319–20); *see also Jones v. UPS*, 214 F.3d 402, 408 (3d Cir.2000) (quoting the same test from *Taylor* for what "a disabled employee must demonstrate" "to show that an employer has violated its duty to engage in the interactive process"). Under the theory of liability advanced by plaintiffs and certified by the District Court, the policies alleged in plaintiffs' claims, if proven to exist, evidence UPS's "systematic failures to engage in the mandatory interactive process in good faith and to make reasonable accommodations," Pls.' Br. 3 (citing Hohider & DiPaolo Compl. ¶¶ 4, 6–7, 11; Branum Compl. ¶¶ 13, 15–16) [16]—a violation of

---

**16.** According to the court,

> [plaintiffs'] reasonable accommodation policies claims can be further distinguished [from one another]. Plaintiffs' principal al-

legation appears to be that UPS enforces an unwritten, de facto "100% healed" return-to-work policy (the "100% healed policy claim"). Plaintiffs argue that the 100%

UPS's obligation, as a covered entity under the ADA, to reasonably accommodate otherwise qualified individuals with disabilities.[17]

healed policy claim, if proven, constitutes a *per se* violation of the ADA's requirements relating to the making of reasonable accommodations. That is, plaintiffs argue that at the merits stage of this litigation, with respect to the 100% healed policy claim, if plaintiffs prove the existence of the alleged 100% healed policy, the policy could be declared unlawful and appropriate injunctive and declaratory relief could flow from that determination. Plaintiffs' other reasonable accommodation policies claims appear primarily to be alleging violations of the ADA as a result of the implementation of those policies and not as *per se* violations. *Hohider*, 243 F.R.D. at 153.

17. Plaintiffs also assert UPS's policies, if proven to exist, would demonstrate that UPS "regards as disabled" all individuals against whom those policies are applied, thereby proving "disability" under the ADA on a classwide basis. *See* ADA, 42 U.S.C. § 12102(1) (defining "[t]he term 'disability' ... with respect to an individual" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment"). We held in *Williams* that " 'regarded as' employees under the ADA are entitled to reasonable accommodation in the same way as are those who are actually disabled." 380 F.3d at 775.

We note that, during the pendency of this appeal, the ADA Amendments Act of 2008 (ADAAA) was signed into law, becoming effective January 1, 2009. *See* Pub.L. No. 110–325, § 8, 122 Stat. 3553, 3559 (to be codified at 29 U.S.C. § 705 note). The ADAAA amends the ADA in important respects, particularly with regard to the definition and construction of "disability" under the statute. For instance, while the general definition of "disability" in 42 U.S.C. § 12102(1) retains largely the same language, the ADAAA adds a provision addressing the intended scope of the "regarded as" prong of that definition. It specifies that "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." Pub.L. No. 110–325, § 4(a), 122 Stat. at 3555 (to be codified at 42 U.S.C. § 12102(3)(A)); *see also id.* (to be codified at 42 U.S.C. § 12102(3)(B)) ("[The 'regarded as' prong of § 12102(1)] shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less."). The ADAAA also makes clear that "[a] covered entity under [Title I of the ADA] ... need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in [§ 12102(1)] solely under [the 'regarded as' prong] of such section." *Id.* § 6(a)(1), 122 Stat. at 3558 (to be codified at 42 U.S.C. § 12201(h)).

The parties dispute the applicability and effect of the ADAAA with respect to the class certified by the District Court. Plaintiffs contend the class claims should be evaluated under the ADA as amended by the ADAAA, and that these amendments only make the claims more amenable to class treatment. UPS objects to such application of the ADAAA as impermissibly retroactive. Furthermore, UPS contends the ADAAA eliminates any entitlement to reasonable accommodation that plaintiffs asserting "disability" under the ADA solely under the "regarded as" prong may have previously enjoyed. *See id.* Thus, according to UPS, if the ADAAA were found to apply, its amendments would effectively remove any claim to relief the class may have had.

In light of our analysis *infra*, we need not reach this dispute. As we will discuss, plaintiffs' inability to demonstrate on a classwide basis that all class members are "qualified" under the ADA renders certification of the class improper. The ADAAA is silent as to this statutory element, neither removing it nor otherwise purporting to amend its definition or construction. *See, e.g., id.* § 5(a), 122 Stat. at 3557 (to be codified at 42 U.S.C. § 12112) (amending § 12112(a) and (b)'s prohibition of discrimination against a "qualified individual with a disability because of the disability of such individual" to prohibit discrimination against a "qualified individual on the basis of disability"). Accordingly, even if we were to apply the ADAAA to plaintiffs' claims in the manner they desire, it would not affect our determination that the class was improperly

### B.

As the District Court recognized, were the liability standards outlined above to control the adjudication of plaintiffs' claims, class certification would be improper. For a plaintiff to be "qualified" under the ADA, he "must 'satisf[y] the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.' and, [he] must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodations.'" *Taylor*, 184 F.3d at 311 (first alteration in original) (quoting *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir.1998)). The class, as defined, contains no unifying or limiting criteria—with respect to employment positions held or desired, for instance, or conditions suffered, or accommodations sought—that potentially would permit classwide evaluation of whether each member of the class is "qualified" and thus can perform the essential functions of a given job with or without reasonable accommodation. Nor does proof of the existence of the policies alleged in plaintiffs' claims resolve these inquiries. Rather, analysis of the ADA's "qualified" standard, if necessary to a determination of classwide liability against UPS, would render plaintiffs' claims unsuitable for certification under Rule 23(a) and (b)(2). *See Hohider*, 243 F.R.D. at 191.

The District Court found, however, that it could adjudicate plaintiffs' claims and reach a finding of classwide liability and relief without undertaking individualized inquiries into qualification (and thus reasonable accommodation) with respect to the class. As discussed, the court premised this determination on its adoption of

the *Teamsters* evidentiary framework. According to the court, "the trilogy of decisions comprised of *Franks, Teamsters*, and *Cooper* makes clear that the elements of proof for plaintiffs proceeding to litigate class claims alleging a pattern or practice of discrimination pursuant to the *Teamsters* framework are distinct from the elements of proof in an individual discrimination case." *Id.* at 204. Since "[p]laintiffs . . . will be allowed to litigate their pattern-or-practice claims for injunctive relief pursuant to the elements of a prima facie case set forth in *Teamsters*," the court concluded they "will not be required to make out the elements for an individual ADA claim if some or all of their claims are certified for declaratory and injunctive relief." *Id.* at 208. By the District Court's analysis, the elements of qualification and reasonable accommodation are among those that, while perhaps necessary to uncovering "the reason for a particular employment decision" and thus resolving an individual claim of discrimination under the ADA, are not likewise necessary to determining at the first *Teamsters* stage whether an employer has engaged in a "'pattern of discriminatory decisionmaking'" prohibited under that statute. *Cooper*, 467 U.S. at 876, 104 S.Ct. 2794 (quoting *Teamsters*, 431 U.S. at 360 n. 46, 97 S.Ct. 1843); *see id.* at 875–76, 104 S.Ct. 2794 (contrasting the *McDonnell Douglas* framework for individual claims of discrimination and the *Teamsters* framework for pattern-or-practice claims). In support of this analysis, plaintiffs point to *Franks* and *Teamsters*, where inquiry into whether individual class members were actual victims of discrimination—including whether each class member was qualified for the job sought—was reserved for the second stage

certified. As such, we decline to resolve whether the ADAAA and its amendments apply to plaintiffs' claims. For the sake of consistency with the District Court's analysis, we

have cited to the pre-ADAAA version of the ADA in our analysis. This does not reflect any determination regarding the applicability of the ADAAA to plaintiffs' claims.

of proceedings, and did not need to be addressed for a finding of classwide liability and relief to be reached. *See Teamsters*, 431 U.S. at 359, 369 n. 53, 97 S.Ct. 1843; *Franks*, 424 U.S. at 772–73, 96 S.Ct. 1251. Plaintiffs reason that, since "[i]t is axiomatic ... that proof of class member 'qualification' in a Title VII class action is reserved for the remedial phase of the litigation," and since "proving 'qualification' is not measurably different in an ADA class action than in a Title VII one," under both statutes "this element of proof is harmonious with the *Teamsters* framework because it is determined only after proving the existence of systemic discrimination." Pls.' Br. 36.

We disagree with this line of reasoning. As noted, the ADA, and not the *Teamsters* method of proof, dictates what substantive elements are necessary to reach a determination that UPS has engaged in a pattern or practice of unlawful discrimination, and to what extent these elements may overlap with those necessary to an individual claim of discrimination. That the adjudication of a Title VII class action under the *Teamsters* framework may not require a showing of each class member's qualification to reach a finding of unlawful discrimination, does not mean that the same conclusion applies in the ADA context. Rather, "we 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'"

*Gross*, 129 S.Ct. 2343, 2345 (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 128 S.Ct. 1147, 1153, 170 L.Ed.2d 10 (2008)); *see also id.*, 129 S.Ct. 2343, 2349 n. 2 (concluding, in light of such examination, that "the textual differences between Title VII and the ADEA ... prevent us from applying [the Title VII mixed-motives framework discussed in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003),] to federal age discrimination claims"). The ADA and Title VII, by their plain language, do not treat the qualification inquiry equivalently in their respective statutory schemes, a substantive distinction the District Court failed to incorporate into its certification analysis. Title VII prohibits covered employers from discriminating against "any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).[18] This statutory provision does not speak to qualification, but protects all individuals from discrimination motivated by the immutable characteristics specified in the statute. Courts have undertaken inquiry into whether a plaintiff is qualified in the Title VII context to evaluate "the reason for a particular employment decision" in an individual discrimination case, *Cooper*, 467 U.S. at 876, 104 S.Ct. 2794—namely, to assess, under the *McDonnell Douglas*

---

**18.** Title VII provides:

It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or oth-

erwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). Section 2000e–2(m) clarifies that "[e]xcept as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m).

framework, whether a plaintiff has offered sufficient evidence to raise an inference of discriminatory treatment and to shift onto the defendant the burden of producing a legitimate, nondiscriminatory reason for its conduct. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see also Teamsters,* 431 U.S. at 358 n. 44, 97 S.Ct. 1843 ("Although the *McDonnell Douglas* formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one."). Thus, inquiry into an individual's employment qualifications may be integral to a court's assessment of whether discrimination on the basis of race, color, religion, sex, or national origin has occurred; it is not likewise necessary to a determination of whether such discrimination against that individual, once proven to have occurred, is unlawful under the statute.

The ADA does not define the scope of its protections and prohibitions as broadly as Title VII. As noted, Title I of the ADA prohibits covered employers from discriminating against qualified individuals with disabilities because of their disabilities, a prohibition that includes failing to reasonably accommodate such individuals. *See* 42 U.S.C. § 12112(a), (b)(5). In contrast to Title VII, it does not prohibit discrimi-

nation against *any individual* on the basis of disability, but, as a general rule, only protects from discrimination those disabled individuals who are able to perform, with or without reasonable accommodation, the essential functions of the job they hold or desire. *See Turner v. Hershey Chocolate USA,* 440 F.3d 604, 607 (3d Cir.2006) ("Congress enacted the ADA in 1990 in an effort to prevent otherwise qualified individuals from being discriminated against in employment based on disability." (citing 29 C.F.R. § 1630)); *Gaul,* 134 F.3d at 579 (same); *see also Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (characterizing an ADA plaintiff's "burden of proving that she is a 'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job"—as "an essential element of her ADA case" (quoting 42 U.S.C. § 12111(8))); *Ford v. Schering–Plough Corp.,* 145 F.3d 601, 605 (3d Cir.1998) (recognizing that, generally speaking, "Title I of the ADA restricts the ability to sue under its provisions to a 'qualified individual with a disability'"); *Weigel v. Target Stores,* 122 F.3d 461, 465 & n. 3 (7th Cir.1997) (collecting cases and finding that, since "the ADA's proscription against employment discrimination protects only 'qualified individual[s] with a disability' ..., the elements of a plaintiff's prima facie showing [of discrimination under the *McDonnell Douglas* framework] must ... include a showing that the plaintiff is a member of the protected class—*i.e.,* a 'qualified individual with a disability'" (first alteration in original)).[19] As under Title VII, inquiry

---

**19.** *Cf.* ADA, 42 U.S.C. § 12203(a) (prohibiting "discriminat[ion] against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing under this chapter."). Accordingly, "[u]nlike a plaintiff in an ADA *discrimination* case, a plaintiff in an ADA *retaliation* case need not establish that he is a 'qualified individual with a disability.' " *Krouse v. Am. Sterilizer Co.,* 126

into whether a plaintiff alleging disability discrimination under the ADA is qualified for the employment in question may be relevant to assessing whether that plaintiff has offered evidence sufficient to give rise to an inference that the employer discriminated against him on the basis of a statutorily protected characteristic. *See, e.g., Walton v. Mental Health Ass'n of Se. Pa.,* 168 F.3d 661, 667–68 (3d Cir.1999) ("The *McDonnell Douglas* Title VII burden shifting rules apply to claims of discriminatory treatment under the ADA."); *Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933, 938 (3d Cir.1997); *see also Raytheon Co. v. Hernandez,* 540 U.S. 44, 49 n. 3, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003). Unlike Title VII, however, the ADA explicitly incorporates this inquiry into its definition of prohibited discrimination, and thus generally requires evaluation of whether a disabled individual is "qualified" as defined under the statute to determine not only whether discrimination on the basis of disability has occurred, but more fundamentally, whether such discrimination against that individual is unlawful.

Analysis of plaintiffs' particular theories of discrimination under the ADA bears out this general distinction between the statutes. These theories all require inquiry into whether class members are "qualified"—which includes whether they can or need to be reasonably accommodated—before a classwide determination of unlawful discrimination, as contemplated at the first *Teamsters* stage, can be reached. By the plain language of 42 U.S.C. § 12112(b)(5),

whether UPS unlawfully discriminated against employees by failing to grant reasonable accommodations cannot be determined without assessing whether those employees are "otherwise qualified individuals with disabilities." If a disabled employee cannot perform the essential functions of the job he seeks or desires with or without an accommodation that is reasonable and that does not impose an undue hardship on the employer, then under the terms of the ADA, the employee is not entitled to an accommodation and the employer does not "discriminate" against the employee in failing to grant him one. *See, e.g., Williams,* 380 F.3d at 771 ("[A] failure to make a reasonable accommodation for a disabled and qualified employee constitutes discrimination under the ADA." (citing *Taylor,* 184 F.3d at 306)).

The same holds true for plaintiffs' interactive-process theory of discrimination. Under that theory, it may be easier to envision a classwide claim of discriminatory treatment: that UPS, by adopting and implementing the policies alleged by plaintiffs, systematically refuses to engage in any sort of interactive process with employees who are seeking to return to work after medical leave but are restricted in their ability to perform their former job. Rather than assessing whatever individual limitations these employees may have and determining what accommodations, if any, may be reasonable and effective in addressing those limitations, UPS, as a matter of blanket policy, simply refuses to employ them. Under this theory of discrimination, UPS's systematic denial of in-

F.3d 494, 502 (3d Cir.1997). "That conclusion follows inexorably from the unambiguous text of the ADA. The Act not only applies to those who are protected because they are 'disabled' as defined therein." It also protects *"any individual"* who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA. This

differs from the scope of the ADA disability discrimination provision, 42 U.S.C. § 12112(a), which may be invoked only by a "qualified individual with a disability." *Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 188 (3d Cir.2003) (quoting *Krouse,* 126 F.3d at 502 (some citations omitted) (emphasis added)).

dividualized consideration, in itself, constitutes a violation of the ADA, and can be proven without any showing that a given individual was "qualified" under that statute.

We have recognized that "[w]hen the interactive process works well, it furthers the purposes of ... the ADA." *Mengine,* 114 F.3d at 420; *see also Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 192 (3d Cir.1999) (noting the "general logic of the ADA ... requires an interactive relationship between employer and employee, and ... an individualized evaluation of employees' impairments"). Engaging in a good-faith interactive process may "not only lead to identifying a specific accommodation that will allow a disabled employee to continue to function as a dignified and valued employee, it may also help sensitize the employer to the needs and worth of the disabled person," *Conneen v. MBNA Am. Bank,* 334 F.3d 318, 330 (3d Cir. 2003), and disabuse the employer of any misperceptions it may have of the employee's condition and qualification for employment. *See Pathmark Stores,* 177 F.3d at 192–94 (acknowledging, in its discussion of "regarded as" disability under the ADA, that "the ADA has as a major purpose the protection of individuals who are subject to stereotypes about their abilities," and promulgating a standard for assessing an employer's liability in the "regarded as" context that encourages individualized consideration and "communication between employer and employee, in the same way that the interactive process for determining reasonable accommodations does").

While, for these reasons, we have admonished "employers [to] take seriously the interactive process," *Williams,* 380 F.3d at 772 n. 16, we have not found an employer's failure to engage in that process and grant an employee individualized consideration, with nothing more, amounts

to discrimination prohibited under the ADA. Rather, if the employee "is not a 'qualified individual' under the ADA, ... [the employer's] alleged failure to investigate into reasonable accommodation is unimportant." *Gaul,* 134 F.3d at 581; *see Mengine,* 114 F.3d at 420 ("[W]here a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." (alteration in original) (quoting *Willis v. Conopco, Inc.,* 108 F.3d 282, 285 (11th Cir.1997))); *Donahue v. Consol. Rail Corp.,* 224 F.3d 226, 233–34 (3d Cir.2000) (finding the same under the Rehabilitation Act, and rejecting the argument that an employer's "failure to engage in good faith in the interactive process was alone sufficient to defeat summary judgment and might even give rise to an independent cause of action"); *see also* 29 C.F.R. § 1630.2(*o*)(3) (characterizing the interactive process potentially required under the ADA as one between an employer and a "qualified individual with a disability"). "If it turns out there is no job which the worker (with or without accommodation) is capable of performing, then the company cannot be held liable for an ADA ... violation." *Mengine,* 114 F.3d at 420; *see Williams,* 380 F.3d at 772 ("[B]ecause employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable *if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations.*" (quoting *Donahue,* 224 F.3d at 234–35)); *Taylor,* 184 F.3d at 317, 318 n. 9 ("The interactive process does not ... remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions," and "the process is not necessary in cases where accommodation is impossible."); *Mengine,* 114 F.3d at

420 ("The ADA, as far as we are aware, is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made." (quoting *Willis*, 108 F.3d at 285)).[20]

Accordingly, while "an employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA," *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 149 (3d Cir.1998) (en banc), failure to engage in the interactive process, in itself, does not constitute such a violation. *See Shapiro v. Twp. of Lakewood*, 292 F.3d 356, 359 (3d Cir.2002); *Mengine*, 114 F.3d at 420–21; *see also Pathmark Stores*, 177 F.3d at 193 (noting that "an employer [who acts on the belief that a perceived disability inherently precludes performance of the essential functions of a job, with or without accommodation] is failing to make an individualized determination, as the ADA requires, and thus acts at its peril," as "the employer

must be correct about the affected employee's ability to perform the job in order to avoid liability"). This is consistent with the plain language of the ADA, which only characterizes as unlawful discrimination an employer's failure to reasonably accommodate an "otherwise qualified individual" when that accommodation does not impose an undue hardship, and which does not speak directly to the process employers should undertake in doing so. *See* 42 U.S.C. § 12112(b)(5); *see also Williams*, 380 F.3d at 771 (" 'The ADA itself does not refer to the interactive process,' but does require employers to 'make reasonable accommodations' under some circumstances for qualified individuals." (quoting *Shapiro*, 292 F.3d at 359)).

In the same vein as their interactive-process theory of discrimination, "plaintiffs argue that 100% healed policies are *per se* unlawful under the ADA" because they inherently deny employees individualized consideration and reasonable accommodation.[21] *Hohider*, 243 F.R.D. at 216. Un-

---

**20.** *See also, e.g., Battle v. UPS*, 438 F.3d 856, 864 (8th Cir.2006) ("Under the ADA, if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process."); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir.2005) ("Failure to engage in th[e] 'interactive process' cannot give rise to a claim for relief ... if the employer can show that no reasonable accommodation was possible. Therefore, we ordinarily look first to whether there is a genuine issue of material fact regarding the availability of a reasonable accommodation, and if it is clear that no reasonable accommodation was available, we stop there." (internal quotation marks omitted)); *Kvorjak v. Maine*, 259 F.3d 48, 52–53 (1st Cir.2001) ("Although we have noted that there may be situations in which failure to engage in the process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA, we also consider such an omission of no moment if the record forecloses a finding that the plaintiff could perform the duties of the job,

with or without reasonable accommodation." (internal quotation marks and citations omitted)); *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir.2000) (en banc) (collecting cases and "hold[ing] that employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible"), *vacated in part on other grounds*, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1174 (10th Cir.1999) (en banc) ("Even if [the employer] failed to fulfill its interactive obligations to help secure a reassignment position, [the employee] will not be entitled to recovery unless he can also show that a reasonable accommodation was possible and would have led to a reassignment position.").

**21.** The Ninth Circuit has held " '100% healed' policies are *per se* violations of the ADA. A '100% healed' or 'fully healed' policy discriminates against qualified individuals with disabilities because such a policy permits em-

der this theory, according to plaintiffs, "if they can establish the existence of the alleged 100% healed policy, no further proof would be needed to establish liability under the ADA." *Id.*

We have not previously addressed whether "100% healed" policies constitute per se discrimination under the ADA, and we need not do so here. Even if we were to adopt that theory, we do not believe plaintiffs can reach a determination of unlawfulness under the ADA by proving only the existence of a "100% healed" policy, without any inquiry into whether that policy has been used to discriminate against individuals protected by the ADA from such discrimination. *Cf. Henderson v. Ardco, Inc.*, 247 F.3d 645, 653 (6th Cir. 2001) (finding plaintiff's argument that a " '100% healed' rule was a per se violation of the ADA" because it denied her "individual assessment for her position" impermissibly "foreshorten[ed] the inquiry" necessary under the ADA, as such policies do not violate the ADA when applied to individuals not "disabled" under the statute). Rather, by our understanding, such a policy could be per se violative of the ADA because, when it is applied against qualified individuals with disabilities, it would, by its very terms, discriminate against those protected individuals on the basis of their disabilities, systematically denying them the reasonable accommodations to which they are entitled and excluding them from employment for which they are otherwise qualified. Thus, as with an employer's blanket refusal to engage in an interactive process with its employees, an employer's "100% healed" policy, even if deemed per se discriminatory, cannot give rise to a finding of liability and relief un-

der the ADA without the statutorily required inquiry into whether those affected by policy are disabled and able to perform the essential functions of the jobs they seek or desire with or without reasonable accommodation. *See, e.g., Warmsley v. N.Y. City Transit Auth.*, 308 F.Supp.2d 114, 119–22 (E.D.N.Y.2004) (finding the existence of a "100% healed" policy per se satisfies plaintiff's showing of discrimination on the basis of disability, but also requiring that plaintiff be "disabled" and "otherwise qualified" to have an ADA claim); *Hammer v. Bd. of Educ.*, 955 F.Supp. 921, 927 (N.D.Ill.1997) (denying plaintiff's request for summary judgment with respect to the claim that defendant "committed a per se violation of the ADA" by implementing an alleged "no work restrictions" policy, in part because "there [wa]s a genuine question of fact regarding whether or not plaintiff was capable of performing the essential functions of his job either with or without reasonable accommodation"); *Norris v. Allied–Sysco Food Servs., Inc.*, 948 F.Supp. 1418, 1438 (N.D.Cal.1996) (discussing different potential interpretations of the per se theory of liability under the ADA, all of which contemplate that "the employee could have been reasonably accommodated (without undue hardship) in a manner contrary to the [per se discriminatory] policy but was not" in order to find that the "employer violates the ADA" by implementing the policy); *Hutchinson v. UPS*, 883 F.Supp. 379, 397–98 (N.D.Iowa 1995) (finding that a "100% healed" policy is per se discriminatory, but that plaintiff could not assert this per se claim because she was not "disabled" and thus lacked standing to sue

ployers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential func-

tions of his or her job either with or without accommodation." *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir.1999).

under the ADA); *see also McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir.1999) (explaining that, under the per se theory, "[a] '100% healed' ... policy discriminates against *qualified individuals with disabilities* " because of the "individual assessment" it denies those "qualified individual[s]" (emphasis added)).[22]

## C.

Based on this analysis of plaintiffs' claims under the ADA, assessment of whether class members are "qualified" is necessary to determine whether UPS has engaged in a pattern or practice of unlawful discrimination and thus can be held liable for violating the ADA with respect to the class. As discussed, in this case the ADA's "qualified" standard cannot be evaluated on a classwide basis in a manner consistent with Rule 23(a) and (b)(2); applying the *Teamsters* evidentiary framework to plaintiffs' claims does not remove this impediment to certification, even if all that is considered is the first, "liability" stage of that framework. *See Teamsters* 431 U.S. at 359–60 n. 45, 361, 97 S.Ct. 1843 (noting that the "liability" stage of the framework contemplates a "finding of a pattern or practice [of unlawful discrimination that] change[s] the position of the employer to that of a proved wrongdoer" and that "[w]ithout any further evidence ... justifies an award of prospective relief"). Because the statutorily required inquiry into qualification is incompatible with the requirements of Rule 23 in this case, and because plaintiffs cannot adjudicate their claims and requested relief with-

out it, the class cannot be certified. *See* Rules Enabling Act, 28 U.S.C. § 2072(b).

The District Court neglected to incorporate this substantive evaluation of the ADA into its application of the *Teamsters* framework to plaintiffs' claims. In its analysis, the court acknowledged that "[f]rom [our case law], it can be inferred that merely showing that an employer has failed to engage in the interactive process is not sufficient to recover under the ADA for a failure to make a reasonable accommodation claim, although it might bear on the proof of such a claim." *Hohider,* 243 F.R.D. at 191. It also recognized that "none [of the cases relied upon by plaintiffs in support of their per se theory of discrimination] are directly on point for this case where plaintiffs ... seek to proceed in a class action" and "where the parties ... dispute whether the named plaintiffs and putative class members are qualified individuals under the ADA." *Id.* at 218. The court found, however, that since *Teamsters* applied, it did not need to address these substantive uncertainties in its analysis—it could certify for class treatment plaintiffs' interactive-process theory of discrimination without resolving whether failure in the process itself gives rise to liability, and it did not need to "assess the merits of plaintiffs' argument that 100% healed policies are *per se* violations of the ADA. It is enough for the court to find that this issue presents a common issue of law to further support the finding that the Rule 23(a) commonality requirement is met in this case with respect to plaintiffs' 100% policy claim." *Id.*

Evaluation of what substantive elements are necessary to prove plaintiffs' theories

**22.** *Cf. Bates,* 511 F.3d at 989, 994 (finding, in its review of a liability determination under 42 U.S.C. § 12112(b)(6) in a private-plaintiff ADA class action, that "[b]efore an employee can challenge an employer's [facially discriminatory] qualification standard, ... an employee must first prove that he is a 'qualified individual' within the meaning of the ADA," and remanding for proper consideration of qualification and reasonable accommodation).

of discrimination touches upon the merits of their claims. It is also critical to the class certification analysis in this case, and is thus properly undertaken at this stage. "Because the decision whether to certify a class 'requires a thorough examination of the factual and legal allegations,' the court's rigorous analysis may include a 'preliminary inquiry into the merits,' and the court may 'consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.'" *In re Hydrogen Peroxide*, 552 F.3d at 317 (citations omitted) (quoting *Newton*, 259 F.3d at 166, 168). "An overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met." *Id.* at 316. Rather, "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Id.* at 307; *see also id.* at 319 ("A critical need is to determine how the case will be tried." (quoting Fed.R.Civ.P. 23 advisory committee's note, 2003 Amendments)).

Here, the District Court found plaintiffs' claims could be adjudicated under the *Teamsters* evidentiary framework. To envision the form that a trial on these claims would take under this framework and to determine if the trial would be suitable for class treatment, it was necessary for the court to evaluate what substantive elements must be addressed to determine whether UPS engaged in a pattern or practice of unlawful discrimination. While it did not need to resolve, for instance, whether UPS's alleged "100% healed" policy amounts to a per se violation of the ADA, it did need to determine what elements plaintiffs would have to prove under that theory to reach a finding of liability and relief, and then assess whether this proof can be made within the parameters of Rule 23. Noting that the viability of the per se theory would affect all class members alleging discrimination on the basis of the "100% healed" policy, without addressing whether in this case the theory can be adjudicated in a manner consistent with Rule 23, is not a sufficiently rigorous analysis to support certification. *See id.* at 326, 97 S.Ct. 1843 ("We emphasize that '[a]ctual, not presumed, conformance' with the Rule 23 requirements is essential." (alteration in original) (quoting *Newton*, 259 F.3d at 167)); *see also Falcon*, 457 U.S. at 160, 102 S.Ct. 2364.[23]

**23.** The District Court's treatment of the ADA's "disability" requirement suffers from the same analytical deficiency. As noted, plaintiffs assert that UPS, by operation of its discriminatory policies, "regards as disabled" all class members. UPS contends plaintiffs' "regarded as" theory cannot be proven on a classwide basis in this case, but rather, like the ADA's "qualified" standard, would entail individualized inquiries too extensive and divergent to meet Rule 23's requirements.

In its certification analysis, the District Court recognized that "[w]hether plaintiffs can prove their 'regarded as' theory of discrimination in this case with respect to the 100% healed policy and the other policies in the lawsuit that are certified ... presents an additional common issue in this case." *Hohider*, 243 F.R.D. at 220. It also found that "[t]he actions of UPS with respect to [each named plaintiff] implicate the policies in issue and if at the merits stage they are proven to exist would implicate that [each named plaintiff] was regarded as disabled." *Id.* at 229–30. Identifying the "regarded as" theory of disability as one common to the class and applicable to its named representatives, however, does not establish that the theory can be proven on a classwide basis—namely, that proof of the existence of the policies alleged in the class claims would result in a common finding of disabled status with respect to every potential class member. In fact, the court seems to undermine such a conclusion in its analysis of plaintiffs' proposed class defini-

In certifying plaintiffs' claims, the District Court concluded the elements of qualification and reasonable accommodation were unnecessary to the adjudication of the claims and relief certified for class treatment. The court based this conclusion solely on its understanding of the *Teamsters* method of proof. It did not adequately consider whether the manner in which it applied this evidentiary framework to plaintiffs' claims of discrimination was supported by the ADA, the statutory basis for those claims. Namely, the court did not address whether, under the ADA, an employer's failure to engage in an interactive process with its employees, or its implementation of a "100% healed" policy, can amount to unlawful discrimination without a showing that this conduct affected "otherwise qualified individuals with disabilities." *See* 42 U.S.C. § 12112(b)(5). Instead, the court relied on the *Teamsters* evidentiary framework to excise these inquiries from its certification analysis, while neglecting to reconcile whether the consequences of that analysis were substantively compatible with the ADA. Such reliance was erroneous, and resulted in the improper grant of certification to the class.

## V.

In addition to the individualized inquiries necessary to adjudicate plaintiffs' claims, UPS contends the nature of the relief sought by plaintiffs renders the class ineligible for certification under Rule 23(b)(2). As noted, Rule 23(b)(2) is intended for classes where "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). The advisory committee's 1966 note to Rule 23(b)(2) specifies that "[t]he subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed.R.Civ.P. 23(b)(2) advisory committee's note, 1966 Amendment. According to UPS, plaintiffs' requests for monetary relief—in the form of back pay and compensatory and punitive damages—predominate over the injunctive and declaratory relief sought, in contravention of Rule 23(b)(2). As the District Court acknowledged, we have not yet spoken on how the predominance of monetary relief in the Rule 23(b)(2) context should be measured and our sister circuits are split on that question, with some adopting the "incidental damages" standard set forth by the Court of Appeals for the Fifth Circuit in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir.1998), and others opting for a more discretionary, "ad hoc balancing" approach such as that used by the Court of Appeals for the Second Circuit in *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001).[24] The court predicted we would

tion, choosing to remove from that definition the requirement that class members be "disabled" under the ADA due to the number of individualized inquiries such a requirement may entail with respect to the class. *See id.* at 209.

As we find the individualized inquiries presented by the ADA's "qualified" standard in this case render class certification of plaintiffs' claims and relief improper, we need not resolve this question. For the reasons discussed *supra*, however, the District Court should have. Instead of fully assessing whether the element of disability, necessary to a determination of unlawful discrimination

under the ADA, could be adjudicated in a manner consistent with Rule 23, the court ended its analysis at the recognition that all plaintiffs allege the same general theory of disability. Such analysis does not meet the level of rigor necessary to support certification.

24. In *Allison*, the Fifth Circuit held that "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief." 151 F.3d at 415. The Fifth Circuit elaborated:

By incidental, we mean damages that flow directly from liability to the class *as a whole*

follow the rationale of the "incidental damages" approach, and reviewed plaintiffs' requested relief under that standard. *Hohider*, 243 F.R.D. at 242. The court found plaintiffs' claims for compensatory and punitive damages were not incidental to the injunctive and declaratory relief sought, and thus not suitable for 23(b)(2) certification. The court determined, however, that back pay "is precisely the kind of monetary relief that could constitute incidental damages under *Allison*," *id.* at 244, as it is "the kind of equitable remedy that could flow directly from liability to the class as a whole on the claims forming the basis of

> on the claims forming the basis of the injunctive or declaratory relief. Ideally, incidental damages should be only those to which class members automatically would be entitled once liability to the class (or subclass) as a whole is established. That is, the recovery of incidental damages should typically be concomitant with, not merely consequential to, class-wide injunctive or declaratory relief. Moreover, such damages should at least be capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances. Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions.

*Id.* (citations omitted).

In *Robinson*, the Second Circuit "decline[d] to adopt the incidental damages approach set out by the Fifth Circuit in *Allison*," 267 F.3d at 164, opting instead for an "ad hoc balancing" approach:

> [W]hen presented with a motion for (b)(2) class certification of a claim seeking both injunctive relief and non-incidental monetary damages, a district court must consider the evidence presented at a class certification hearing and the arguments of counsel, and then assess whether (b)(2) certification

the injunctive or declaratory relief." *Id.* at 243; *see also id.* at 243–44 ("Recovery of back pay, if it is 'capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances,' 'does not require additional hearings to resolve the disparate merits of each individual's case,' and does not 'introduce new and substantial legal or factual issues, nor entail complex individualized determinations.'" (quoting *Allison*, 151 F.3d at 415)). Accordingly, in its certification order, the court allowed for the possibility that plain-

> is appropriate in light of the relative importance of the remedies sought, given all of the facts and circumstances of the case. The district court may allow (b)(2) certification if it finds in its informed, sound judicial discretion that (1) the positive weight or value to the plaintiffs of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy.
>
> Although the assessment of whether injunctive or declaratory relief predominates will require an ad hoc balancing that will vary from case to case, before allowing (b)(2) certification a district court should, at a minimum, satisfy itself of the following: (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery.

*Id.* (internal quotation marks, brackets, and citations omitted); *see also Molski v. Gleich*, 318 F.3d 937, 949–50 & 950 n. 15 (9th Cir. 2003) (rejecting the Allison approach in favor of "a similar approach [to the one set forth] in *Robinson*," "focus[ing] on the language of Rule 23(b)(2) and the intent of the plaintiffs in bringing the suit").

tiffs may seek, in addition to injunctive and declaratory relief, "back pay or other equitable relief for individual class members if there is a protocol for identifying those monetary damages which sets forth the objective standards to be utilized in determining the amount of those damages in a way that does not require additional hearings on individualized circumstances." *Id.* at 245.

Neither party challenges the court's adoption of the "incidental damages" approach to measure monetary predominance, or the court's determination that plaintiffs' requested compensatory and punitive damages are ineligible for class treatment under Rule 23(b)(2). Nor does our preceding analysis of plaintiffs' claims require us to take up these matters. As discussed, the individualized inquiries necessary to determine whether UPS has engaged in a pattern or practice of unlawful discrimination under the ADA render certification of this class improper, even if plaintiffs were to seek solely injunctive or declaratory relief. As UPS has not acted "on grounds that apply generally to the class, so that final injunctive relief and corresponding declaratory relief is appropriate respecting the class as a whole," Fed.R.Civ.P. 23(b)(2), there is no need to evaluate whether monetary relief predominates over that injunctive and declaratory relief.

Furthermore, even if we were to agree with the District Court that a finding of liability and an award of injunctive and declaratory relief could be reached on a classwide basis without addressing these individualized inquiries, such inquiries, under the court's analysis, would still be necessary to address certain questions of individual relief with respect to each class member. *See Hohider,* 243 F.R.D. at 208 n. 69 ("[T]he individual elements of a reasonable accommodation claim may be relevant at the second, remedial stage of proceedings if plaintiffs seek individual relief on behalf of individual class members."). As such, plaintiffs' requested compensatory and punitive damages would be ineligible for class treatment under Rule 23(b)(2), regardless of whether the "incidental damages" or the "ad hoc balancing" approach is applied. *See Allison,* 151 F.3d at 415 ("Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations."); *Robinson,* 267 F.3d at 164 ("The district court may allow (b)(2) certification if it finds in its informed, sound judicial discretion that ... class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy." (internal quotation marks omitted)).

According to UPS, the District Court's determination that compensatory and punitive damages predominate, in itself, precludes certification of the class in its entirety under Rule 23(b)(2), and the court erred by choosing instead to sever the problematic relief from the class and certify what remained. Plaintiffs respond that the court acted within its proper discretion under Rule 23(c)(4), which provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R.Civ.P. 23(c)(4). Given the class certification's other defects, we need not resolve this matter here[25] but we note that a

---

25. The interaction between the requirements for class certification under Rule 23(a) and (b) and the authorization of issues classes under Rule 23(c)(4) is a difficult matter that has generated divergent interpretations among the courts. *Compare, e.g., Castano v. Am.*

court's decision to exercise its discretion under Rule 23(c)(4), like any other certification determination under Rule 23, must be supported by rigorous analysis. Furthermore, we believe several considerations are relevant to determining "[w]hen [it is] appropriate" for a court to certify a class only "with respect to particular issues," Fed.R.Civ.P. 23(c)(4): the type of claim(s) and issue(s) in question; the overall complexity of the case and the efficiencies to be gained by granting partial certification; the substantive law underlying the claim(s), including any choice-of-law questions it may present; the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); the potential preclusive effect that resolution of the proposed issues class will have; and so forth. *See, e.g., Principles of the Law of Aggregate Litigation* ch. 2 (A.L.I. Pro-

---

Tobacco Co., 84 F.3d 734, 745–46 n. 21 (5th Cir.1996) ("A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended." (citations omitted)), *and Allison,* 151 F.3d at 421–22 (finding plaintiffs' request to "certify[ ] the first [*Teamsters* ] stage of [their Title VII] pattern or practice claim under (b)(3) is foreclosed by *Castano,*" considering that the claim as a whole "implicates predominantly individual-specific issues" and "the plaintiffs have not agreed drop their claims for compensatory and punitive damages *as a class action issue* "), *with In re Nassau County Strip Search Cases,* 461 F.3d 219, 227 (2d Cir.2006) ("[A] court may employ subsection (c)(4) to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement."), *and Robinson,* 267 F.3d at 167 & n. 12, 169 (calling into question the understanding of Rule 23(c)(4) expressed in *Castano* and *Allison* and finding the district court erred "in not certifying the liability stage of the pattern-or-practice disparate treatment claim for (b)(2) treatment," as courts "should take full advantage of [Rule 23(c)(4)] to certify separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies" (internal quotation marks and ellipsis omitted)).

We have not yet engaged this specific question, nor need we do so here. In *Chiang v. Veneman,* we stated "Rule 23(c)(4) both imposes a duty on the court to insure that only those questions which are appropriate for class adjudication be certified, and gives it ample power to 'treat common things in common and to distinguish the distinguishable.' " 385 F.3d 256, 267 (3d Cir.2004) (quoting *Jenkins v. United Gas Corp.,* 400 F.2d 28, 35 (5th Cir.1968)). Plaintiffs rely on this description of Rule 23(c)(4) to support the District Court's decision to sever their compensatory and punitive damages claims rather than deny certification entirely. While this language recognizes, as a general matter, the discretion vested in courts by Rule 23(c)(4), we do not believe *Chiang* sheds much light on the overall contours of that discretion or on the propriety of the District Court's use of Rule 23(c)(4) in the case before us. *Chiang* involved a class seeking certification for claims of discrimination based on race, gender, and national origin under the Equal Credit Opportunity Act (ECOA), which, in language similar to Title VII, prohibits creditors from discriminating on various grounds in the credit-transaction context. *See id.* at 259 (quoting ECOA, 15 U.S.C. § 1691(a)). With respect to Rule 23(c)(4), we found that, because the issue of whether the defendant engaged in the alleged discriminatory course of conduct was "easily distinguishable" from the issue of whether class members were individually eligible to receive loans, it would be permissible to "affirm certification on the former and leave it to the district court to determine whether class certification might be appropriate on the latter." *Id.* at 267. We note, however, that *Chiang* involved none of the complexities that are present here.

posed Final Draft Apr. 1, 2009). Once the District Court decided that plaintiffs' compensatory and punitive damages claims were incompatible with Rule 23(b)(2), however, it did not explain why this determination did not interfere with certification of the class for other purposes, nor did it address what effect, if any, such partial certification would have on the class action going forward.[26]

■ In a similar vein, we agree with UPS that the District Court's conditional certification of plaintiffs' request for back pay was improper. A trial court must "make a definitive determination that the requirements of Rule 23 have been met before certifying a class." *In re Hydrogen Peroxide*, 552 F.3d at 320; *see also id.* at 319 (noting that the 2003 amendments to Rule 23 "eliminated the language that had appeared in Rule 23(c)(1) providing that a class certification 'may be conditional' "). While courts retain discretion under Rule 23(c)(1)(C) to "alter[ ] or amend[ ] before final judgment" an order granting or denying class certification, *see id.* at 319 n. 21, "courts should not grant certification except after searching inquiry, and ... should not rely on later developments to determine whether certification is appropriate." *Id.* at 320 (quoting 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.80[2] (3d ed.2008)). Accordingly, even if the District Court were correct that plaintiffs' claims of injunctive and declaratory relief could be properly certified under Rule 23(b)(2), it was not sufficient for the court simply to identify back pay as potentially incidental to such relief, and grant it certification on the condition that it later prove to be so. Rather, before

moving forward with certification, it was necessary for the court to determine whether plaintiffs' back-pay request actually conforms with the requirements of Rule 23, including Rule 23(b)(2)'s monetary-predominance standard. And, were the court to find such relief could go forward under Rule 23(b)(2), it would then need to address how that relief would be managed, specifying, for example, the methodology by which calculations and awards of relief would be made with respect to individual class members. *See id.* at 319 (pointing out that "in introducing the concept of a 'trial plan,' the Advisory Committee's 2003 note [to Rule 23] focuses attention on a rigorous evaluation of the likely shape of a trial on the issues"). Such rigorous analysis would be appropriate were the court to use either the "incidental damages" or "ad hoc balancing" standard to evaluate plaintiffs' back-pay request, as both stress that only monetary relief sufficiently manageable on a classwide basis may be certified under Rule 23(b)(2). *See Allison*, 151 F.3d at 415 (stating that monetary relief deemed "incidental" and thus certifiable under Rule 23(b)(2) "should at least be capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances"); *Robinson*, 267 F.3d at 164 (finding that "non-incidental" monetary relief may not be certified under Rule 23(b)(2) if it cannot be adjudicated on a classwide basis in an "efficient and manageable" fashion). The court's deferral of this analysis post class certification was an abuse of discretion.

---

**26.** Plaintiffs, for instance, have demanded a jury trial in this case. The District Court did not explain how the severance of plaintiffs' damages claims from the class may affect this demand, particularly with respect to the requirements of the Seventh Amendment—an

issue both *Allison* and *Robinson* take up (albeit divergently) in their partial-certification analyses. *Compare Allison*, 151 F.3d at 422–25, *with Robinson*, 267 F.3d at 169–70 & n. 13.

## VI.

For the foregoing reasons, we find the District Court abused its discretion in granting certification, and the class, as defined, cannot be certified under Rule 23(a) and (b)(2) with respect to its claims and requested relief. Accordingly, we will reverse the District Court's order of class certification and remand for proceedings consistent with this opinion.