RENDERED: JULY 16, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0643-ME

MARION HUGHES; PHILLIP L.
WESTERN; AND TERRI A. ROGERS,
INDIVIDUALLY AND ON BEHALF
OF ALL OTHER PERSONS
SIMILARLY SITUATED                                          APPELLANTS


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE MITCH PERRY, JUDGE
                    ACTION NO. 07-CI-009996


UPS SUPPLY CHAIN SOLUTIONS,
INC.; UNITED PARCEL SERVICE,
INC.; AND DEFENDANTS JOHN
DOE 1-10                                                    APPELLEES


                    OPINION
                    AFFIRMING

                    ** ** ** ** **

BEFORE: JONES, LAMBERT, AND L. THOMPSON, JUDGES.

LAMBERT, JUDGE: This is an interlocutory appeal taken pursuant to Kentucky

Rules of Civil Procedure ("CR") 23.06 by Marion Hughes, Terri A. Rogers, and

Phillip L. Western, as lead plaintiffs for the putative class (hereinafter "Hughes"),[1] from the May 1, 2020, order of the Jefferson Circuit Court denying her motion for class certification of Count I of her Second Amended Complaint. Hughes sought class certification for employees of UPS, Inc., and UPS Supply Chain Solutions, Inc., who were subjected to use of two allegedly illegal leave policies, the 100% Health Leave Policy and the 12 Month Leave Policy (hereinafter, "the Leave Policies Class" or "the Disabled Class"). Because we hold that the circuit court did not abuse its discretion in denying class certification under Count I, we affirm.

This lawsuit began with the filing of a verified class action complaint in the Jefferson Circuit Court on October 10, 2007. Marion E. Hughes, both individually and on behalf of all others similarly situated, was the sole named plaintiff, and she named UPS, Inc., UPS Supply Chain Solutions, Inc., (collectively, "UPS") and 10 John Does as defendants. UPS, Inc., is the parent company of UPS Supply Chain Solutions, Inc., where Hughes was employed. Hughes alleged two claims: a disability discrimination claim under Kentucky Revised Statutes ("KRS") Chapter 344 in Count I and a wage and hour claim under KRS Chapter 337 in Count II. The two claims were later bifurcated. As this

---

[1] Marion Hughes is the only individual plaintiff listed under Count I of the complaint in any of the three complaints she filed. Therefore, she is technically the only individual party properly named as an appellant in this appeal, although she listed Terri A. Rogers and Phillip L. Western as individual appellants in her notice of expedited appeal.

appeal addresses the disability discrimination claim in Count I, we shall only reference the allegations and procedural history in that claim, except in the interest of clarity.

For her disability discrimination claim, Hughes defined the class, which she labeled as the Disabled Class, as follows:

> All job applicants, and all current or former employees of UPS employed in the Commonwealth of Kentucky, with apparent or actual disabilities, or a history of being disabled, who have been denied the benefits of engaging in an interactive process for determining a reasonable accommodation in good faith, and/or who have been denied accommodations for their known disabilities, and/or refused to be reinstated by UPS to work duties that they can perform, with or without accommodation.

The Disabled Class excluded UPS officers, directors, and management, as well as their families. Hughes alleged that the Disabled Class consisted of several hundred persons in Kentucky and that it would be impractical to join all of the members because of its size. She alleged that there was a well-defined community of interest in the questions of law and fact involved in this claim that predominated over questions affecting individual class members, such as whether UPS' policies and procedures violated Kentucky laws and regulations, including KRS Chapter 344. She alleged these claims were typical of the Disabled Class and that she would be able to fairly and adequately represent the interests of the class.

Under the factual allegations section, Hughes alleged that she had a qualified disability as defined under KRS 344.030. She alleged she suffered from chronic fatigue syndrome and fibromyalgia, and that, as a result, she was placed on short-term disability leave by UPS in 2003. She returned to work with restrictions in 2004. She underwent surgery in December 2005 and remained on short-term disability leave until March 11, 2006, when UPS determined that she was no longer disabled. Her restrictions remained, but UPS would not permit her to return to work until she was 100% healthy and under no work restrictions. She was told by Human Resources personnel that UPS had adopted a new 100% healthy policy as of January 1, 2006. Because she was unable to return to work without restrictions, her employment was terminated. As a result of the alleged unlawful policy and conduct, Hughes alleged that she and the members of the Disabled Class had suffered damages including lost wages and benefits, expenses, interest, emotional distress, and attorney's fees.

In October 2010, Hughes moved the court to file a first amended complaint to add additional named plaintiffs to the wage and hours claim in Count II. She stated that the substance of the complaint, including the claims she asserted, remained unchanged.

In November 2010, UPS moved for a partial summary judgment on Hughes' class allegations pursuant to CR 12.03 as to her disability discrimination

-4-

claim. UPS argued that KRS 344.040 prohibits discrimination against qualified individuals with disabilities, which would require the court to make an individualized case-by-case inquiry as to whether each class member met this requirement. Therefore, class certification was not appropriate, and it sought dismissal of the class element. UPS cited to the Third Circuit Court of Appeals' opinion of *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009), in support of this argument. UPS later withdrew the motion in light of its plan to remove the case to federal court. Upon remand, UPS filed another motion seeking the same relief.

In January 2012, Hughes filed a motion seeking an extension of response time and indicated that she intended to file a second amended complaint to clarify her legal theories to avoid confusion as the claims in both counts moved forward. The court granted the motion for extension, providing Hughes with time to file a Second Amended Complaint and UPS with time to confirm whether it wished to proceed with its pending motion for a judgment on Count I.

Hughes filed her motion for leave to file a Second Amended Complaint the following month. As with the filing of the first amended complaint, Hughes confirmed that her claims were not changing and that she was continuing

to seek relief for her wage and hour claim and her leave policies claim.[2]  After stating that UPS had mischaracterized her leave policy claim, Hughes stated she was "further crystaliz[ing]" this claim with additional facts and by narrowing the issue.  She also sought to narrow her proposed class definition.  And she specifically identified the two leave policies she was contesting as the 100% Healthy Leave Policy, as discussed above, and the 12 Month Leave Policy, which had not been previously identified.

UPS objected to the filing of the Second Amended Complaint, noting that Hughes had consistently referred to Count I as a disability discrimination class claim based upon the 100% Healthy Leave Policy.  For the first time, she was seeking to add a separate policy, a 12-month administrative termination policy, for which UPS raised a statute of limitations issue.  The court granted the motion to file the Second Amended Complaint on March 7, 2012.

In the Second Amended Complaint, Hughes reiterated that this version did not raise any new claims or add any additional plaintiffs.  It was meant to clarify her claims.  She redefined the "Illegal Disability Leave Policies" class as: "All current and former employees of UPS who were employed in the Commonwealth of Kentucky during the applicable limitations period and who

---

[2] Hughes previously referred to this claim as the disability claim and to the class as the Disability Class.

were subject to a UPS leave policy[.]" She alleged that the Leave Policies Class members were subject to the same two leave policies, that her claim was typical of the class members' claims, that she had common interests with the class members in finding that UPS' leave policies were illegal *per se*, and that she had demonstrated her willingness to prosecute the interests of the class members via her qualified counsel. Hughes alleged that UPS violated Kentucky laws and regulations by adopting these inflexible leave policies and sought damages as a result.

Shortly thereafter, UPS moved to dismiss Hughes' individual and class-wide disability discrimination claims under Count I for failure to state a claim upon which relief could be granted. It continued to argue that the court could not find unlawful disability discrimination under KRS Chapter 344 without an individualized, case-by-case inquiry into whether Hughes and each class member were qualified individuals with a disability. UPS noted that Hughes had removed all allegations in her Second Amended Complaint that she or any putative class member was disabled and instead alleged that the two policies were *per se* violations of KRS 344.030. Because the allegation that a plaintiff is a qualified individual with a disability was a necessary component of a disability discrimination claim, UPS asserted that Hughes' claim must fail.

In response, Hughes argued that her disability leave policies claim had been consistently presented to the court, beginning with the initial complaint, and that UPS' motion to dismiss was untimely and premature procedurally. She continued to assert that UPS' argument was based upon "a significantly false and somewhat misleading premise." Hughes stated that she was not required to prove that she was a qualified individual with a disability. Rather, she was challenging the disability leave policies as "an impermissible pattern and practice" that constituted *per se* violations of Kentucky law, entitling her to relief.

In its reply, UPS disputed Hughes' arguments as to whether its motion had been timely and properly filed as well as to whether she must allege that she is a qualified individual with a disability to establish her claim under KRS Chapter 344. Hughes failed to cite any authority for her proposition that she did not need to do so by labeling her claim as asserting a *per se* violation of that chapter. UPS argued that the cases Hughes cited did not support her position as they either explicitly stated or inferred that the requirement to establish that a plaintiff is a qualified individual with a disability remained for discrimination claims.

Hughes filed two supplemental filings following a hearing on June 11, 2012. In the first one, she submitted case law supporting her contention that other courts had certified similar state law claims, including one involving a *per se*

disability claim involving UPS out of California. At the conclusion of that filing, Hughes stated:

> 4. Plaintiff notes that UPS' Leave Policies are *per se* violations of not only KRS 344.040 (e.g. "regarding as" disabled), but also KRS 344.280 (e.g. interfering, obstructing and/or impeding an employee's KRS 344 rights) and KRS 336.700 (e.g. interfering with employee rights under Kentucky law). See also, KRS 446.070 (civil enforcement statute for statutory violations).

In the second filing, she argued that it was not necessary for her to establish a *prima facie* case to survive a motion to dismiss, citing a recent decision by the Sixth Circuit Court of Appeals.

UPS filed a response to these supplemental filings, disputing that her case citations had any relation to the current case. It also pointed out the long list of cases in which courts have denied certification in disability discrimination claims, including *Hohider*, *supra*.

On July 27, 2012, the court entered an opinion and order denying UPS' motion to dismiss, holding that in a light most favorable to Hughes, "there is a set of facts, which if proven could entitle [her] to relief." UPS thereafter filed an answer to Hughes' Second Amended Complaint, including as one of its defenses that Hughes failed to alleged facts sufficient to establish that she or any member of the purported class was a qualified individual with a disability. It specifically asserted that a class action was not appropriate on the disability leave class claim.

-9-

Several years later, on December 5, 2019, Hughes moved the court to certify the Leave Policy Class pursuant to CR 23. She stated that the two policies violated Kentucky law and that class-wide declaratory and injunctive relief was appropriate and necessary.

The next day, UPS filed a motion to dismiss pursuant to CR 41.02 or to strike the class action allegations pursuant to CR 23.04, stating that Hughes had taken no action to advance Count I for almost six years until filing the motion for class certification. In addition to procedural deficits, UPS continued to argue that a disability discrimination claim under KRS Chapter 344 could not be established as a class based upon the individualized assessment such claims entail.

Hughes opposed UPS' motion, arguing that the case had been stayed for appellate resolution of the wage and hour class claim. UPS disputed this statement, reminding the court that the two counts had been bifurcated and were proceeding on different tracks.

The court held a hearing on March 2, 2020, where the parties presented their respective arguments as to class certification and whether the claim should be dismissed. The court requested supplemental briefing, which both parties filed. In her brief, Hughes argued that both policies existed and applied to all non-union employees. She then argued that the leave policies were *per se* violations of Kentucky law, stating:

-10-

> ***Kentucky's protections*** for disability discrimination ***are broader*** than federal law.

>> This Court has said, with regard to Title VII and the Kentucky Civil Rights Act, that "the Kentucky Civil Rights Act (KRS 344.010 et seq.) tracks Title VII, but ***expressly provides broader relief*** than found on the face of the federal statute, 'including damages for humiliation, personal indignity and other intangible injuries.'"

[*Noel v. Elk Brand Mfg. Co.*, 53 S.W.3d 95, 105 (Ky. App. 2000) (emph. added).] As part of these significant protections, Kentucky requires employers provide disabled employees with the opportunity to participate in a timely, interactive, and good faith accommodation process. Kentucky's legislative protections also prohibit employers from obstructing or interfering with any employee's rights.

>> It shall be ***an unlawful practice*** for a person, or for two (2) or more persons to conspire . . . ***to obstruct or prevent*** a person from complying with the provisions of this chapter or any order issued thereunder. [KRS 344.280 "Conspiracy to violate chapter unlawful" (emph. added).]

Further, Kentucky prohibits employers from discharging, discriminating, or limiting a disabled employee's compensation, benefits, privileges, and opportunities. [KRS 344.040(1).] These protections necessarily demand that [an] employer's disability policies – their interactive processes – comply with all other applicable statutes and regulations including, *inter alia*, Kentucky's medical licensing statutes. [KRS 311.560 "Prohibition against practice of medicine . . . without license".]

(Footnote omitted.)

-11-

Hughes went on to address the issues with the leave policies and argued that class certification was proper, stating that the Leave Policy Class was readily identifiable and ascertainable as the policies applied to all non-union employees who worked in a UPS facility.

In its supplemental brief, UPS continued to argue that a class could not be certified because there was no evidence that any class member was a qualified individual with a disability, including Hughes herself. Hughes, UPS asserted, did not address this factor at all in her supplemental filing.

Thereafter Hughes filed "objections" to UPS' supplemental brief, stating that it contained factual inaccuracies, false statements, and misrepresentations. She continued to argue that the "qualified individual with a disability" finding was not relevant to this case as she was contesting the legality of the policies as applied to the class members.

The court heard remote arguments from the parties (due to COVID-19 restrictions) on April 2, 2020. By opinion and order entered May 1, 2020, the court denied Hughes' motion to certify a "Leave Policies" Class and granted UPS' motion to dismiss the class allegations under Count I. The court found that Hughes could not meet three of the four requirements to certify a class as set forth in CR 23.01 (she only met the numerosity requirement), stating that "it would not be administratively feasible for this [c]ourt to determine whether a particular

individual is a member of the proposed class.  The [c]ourt would need to engage in thousands of individual assessments to determine whether each class member is a qualified individual protected under KRS § 344."  In finding that Hughes failed to satisfy the commonality, typicality, and adequacy requirements, the court held that "[e]ven if the Leave Policies were deemed per se discriminatory, . . . [e]stablishing the unlawful discrimination alleged by Plaintiffs would require determining whether class members are 'qualified' under KRS § 344, an inquiry too individualized and divergent to warrant certification under CR 23.01."  This interlocutory and expedited appeal now follows.

On appeal, Hughes contends that the circuit court abused its discretion in denying class certification because it applied an incorrect legal standard or factual predicate.  On the other hand, UPS argues that the circuit court properly ruled in this matter and that Hughes has impermissibly raised an argument for the first time on appeal related to her allegation of specific statutory violations.

Our standard of review in such cases is set forth in *Hensley v. Haynes Trucking, LLC*, 549 S.W.3d 430, 444 (Ky. 2018):

> A trial court's determination as to class certification is reviewed on appeal for an abuse of discretion.  [*Sowders v. Atkins*, 646 S.W.2d 344, 346 (Ky. 1983).]  Under an abuse-of-discretion standard, this Court may reverse a trial court's decision only if "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."  [*Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581

-13-

(Ky. 2000).] "Implicit in this deferential standard is a recognition of the essentially factual basis of the certification inquiry and of the [trial] court's inherent power to manage and control pending litigation." [*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998).] Importantly, "As long as the [trial] court's reasoning stays within the parameters of [CR] 23's requirements for certification of a class, the [trial court's] decision will not be disturbed." [*Hines v. Widnall*, 334 F.3d 1253, 1255 (11th Cir. 2003).]

In addition, the *Hensley* Court emphasized:

> Because of the strict parameters of interlocutory appeals, the only question this Court may address today is whether the trial court properly certified the class to proceed as a class action lawsuit. We must focus our analysis on this limited issue and in so doing scrupulously respect the limitations of the crossover between (1) reviewing issues implicating the merits of the case that happen to affect the class-certification analysis and (2) limiting our review to the class-certification issue itself. Most importantly, "As the certification of class actions . . . . is procedural, *such process cannot abridge, enlarge, or modify any substantive right of the parties*." "The right of a litigant to employ the class-action mechanism . . . is a *procedural right only*, ancillary to the litigation of substantive claims."

*Hensley*, 549 S.W.3d at 436-37 (citations in footnotes omitted).

CR 23 sets forth the applicable rules for class actions in Kentucky.

In practice, CR 23.01 and 23.02 create a two-step analysis for class certification. First, the circuit court must determine if all of CR 23.01's prerequisites have been met. If any of the four are not satisfied, the circuit court must deny class certification. On the other hand, if the circuit court concludes that all four prerequisites of

-14-

CR 23.01 are met, it then proceeds to the second step. The second step requires the circuit court to determine if one of the three conditions of CR 23.02 is satisfied. If none is satisfied, class certification must be denied; however, if at least one of the three conditions is satisfied, the circuit court must certify the class.

*Manning v. Liberty Tire Services of Ohio, LLC*, 577 S.W.3d 102, 111 (Ky. App. 2019). CR 23.01 first provides:

Subject to the provisions of Rule 23.02, one or more members of a class may sue or be sued as representative parties on behalf of all only if (a) the class is so numerous that joinder of all members is impracticable, (b) there are questions of law or fact common to the class, (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (d) the representative parties will fairly and adequately protect the interests of the class.

"The four requirements in CR 23.01 to maintaining a class action can be summed up as *numerosity*, *commonality*, *typicality*, and *adequacy of representation* requirements." *Hensley*, 549 S.W.3d at 442-43 (citation omitted).

CR 23.02, in turn, provides:

An action may be maintained as a class action if the prerequisites of Rule 23.01 are satisfied, and in addition:

(a) The prosecution of separate actions by or against individual members of the class would create a risk of

(i) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or,

-15-

(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(b) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(c) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (iv) the difficulties likely to be encountered in the management of a class action.

The *Hensley* Court also considered what the proponent must demonstrate and what level of analysis a trial court must perform in deciding whether to grant or deny class certification:

In [*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)], the U.S. Supreme Court held that "Rule 23 does not set forth a mere pleading standard. A party seeking class

certification must affirmatively demonstrate his compliance with the Rule - that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." The *Dukes* Court expounded on this rule, stating, "certification is proper only if the trial court is satisfied, *after a rigorous analysis*, that the prerequisites of [Rule 23] have been satisfied." "This 'rigorous analysis' standard will frequently require the trial court 'to probe behind the pleadings before coming to rest on the certification question.'" "As well, this analysis will often entail some review of the merits of the plaintiff's underlying claim."

Although Kentucky has not expressly adopted this standard, this Court "has flirted with accepting this principle, at least to the point of looking beyond the bald allegations in a complaint before certifying a class." We decline to adopt fully the "substantial possibility" test articulated in some jurisdictions. Rather, we will adhere to the guidance the U.S. Supreme Court in *Dukes* has given on this issue. We also acknowledge that our precedent holds that "[i]t is not necessary that there be a complete identification of facts relating to all members of the class as long as there is a common nucleus of operative facts."

*Hensley*, 549 S.W.3d at 445 (citations in footnotes omitted). With this legal

backdrop in mind, we shall consider whether the circuit court properly denied class

certification on this count.

In the present case, the circuit court concluded that Hughes could not

meet three of the four the class requirements of CR 23.01, namely, commonality,

typicality, and adequacy. The commonality element requires a finding of

-17-

"questions of law or fact common to the class[.]"  CR 23.01(b).  The *Hensley*

Court expanded upon this element as follows:

> The U.S. Supreme Court in *Wal-Mart Stores, Inc. v. Dukes* highlighted the focus of the *commonality* question:  Whether the class plaintiffs' claims "depend upon a common contention . . . that is capable of class wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  This Court has also expounded on the *commonality* requirement:  "CR 23.01(b) requires that there must be questions of law or fact common to the class, but it does not require that all questions of law or fact be common."

*Hensley*, 549 S.W.3d at 443 (citation in footnote omitted).

In the section of the opinion and order addressing commonality, the

circuit court cited to *Hohider*, *supra*, in which the Third Circuit Court of Appeals

addressed whether the district court properly granted class certification related to

UPS' 100% healthy policy under a claim for unlawful discrimination under Title I

of the Americans with Disability Acts of 1990, 42 United States Code ("U.S.C.")

§§ 12101-12117 (the ADA).

> Based on this analysis of plaintiffs' claims under the ADA, assessment of whether class members are "qualified" is necessary to determine whether UPS has engaged in a pattern or practice of unlawful discrimination and thus can be held liable for violating the ADA with respect to the class.  As discussed, in this case the ADA's "qualified" standard cannot be evaluated on a classwide basis in a manner consistent with Rule 23(a) and (b)(2)[.]

-18-

*Hohider*, 574 F.3d at 196. The Court explained:

> We have not previously addressed whether "100% healed" policies constitute per se discrimination under the ADA, and we need not do so here. Even if we were to adopt that theory, we do not believe plaintiffs can reach a determination of unlawfulness under the ADA by proving only the existence of a "100% healed" policy, without any inquiry into whether that policy has been used to discriminate against individuals protected by the ADA from such discrimination.

*Id*. at 195.

The circuit court then turned to Kentucky's Civil Rights Act, KRS Chapter 344 (the KCRA), which provides:

> It is an unlawful practice for an employer:
>
> > (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, national origin, sex, age forty (40) and over, because the person is a qualified individual with a disability, or because the individual is a smoker or nonsmoker, as long as the person complies with any workplace policy concerning smoking[.]

KRS 344.040(1). KRS 344.030(1), in turn, defines a "qualified individual with a disability" as:

> [A]n individual with a disability as defined in KRS 344.010 who, with or without reasonable accommodation, can perform the essential functions of

the employment position that the individual holds or desires unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's disability without undue hardship on the conduct of the employers' business. Consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job[.]

Based upon this statutory language, this Court detailed the *prima facie* case a plaintiff must demonstrate to establish a claim for disability discrimination under the KCRA:

> In order to establish a prima facie case of discrimination based on a disability, the plaintiff must show: (1) that he had a disability as that term is used under the statute (i.e., the Kentucky Civil Rights Act in this case); (2) that he was "otherwise qualified" to perform the requirements of the job, with or without reasonable accommodation; and (3) that he suffered an adverse employment decision because of the disability.

*Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 706-07 (Ky. App. 2004).

Here, the circuit court concluded that, even if the policies were *per se* discriminatory, the assessment would require it to determine whether every class member was a qualified individual under the KCRA and thus eligible for its protection. This determination, the court stated, was too individualized and divergent for class certification to be appropriate. We agree and find no abuse of discretion in the circuit court's decision on commonality. The need to analyze

-20-

each proposed class member to ensure that each person is a qualified individual with a disability is too burdensome for class certification. We also agree with the circuit court that the typicality and adequacy elements fail, also based upon the need that each class member must be a qualified individual with a disability. Finally, we agree that the circuit court did not need to address CR 23.02 as Hughes failed to meet all four elements in CR 23.01.

Although we are affirming the circuit court's ruling, we shall address, in part, Hughes' argument that she was not raising a discrimination claim under the KCRA. Rather, she argued that her leave policy claims were based upon UPS' *per se* violation of three statutes, KRS 311.560, KRS 336.700, and KRS 344.280. However, as UPS argued in its brief, Hughes "never articulated a standalone claim under these three statutes" between October 2007 and December 2019. Our review of the voluminous record uncovered very little mention of any of these statutes; we noted these mentions above. These brief mentions were certainly not enough to permit Hughes to make these alleged statutory violations the heart of her appellate argument and escape the application of *Hohider*.

For the foregoing reasons, the opinion and order of the Jefferson Circuit Court denying Hughes' motion for class certification of the Leave Policies Class is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Andrew J. Horne
Louisville, Kentucky

Michael D. Grabhorn
Andrew M. Grabhorn
Louisville, Kentucky

BRIEF FOR APPELLEES UPS
SUPPLY CHAIN SOLUTIONS, INC.,
AND UNITED PARCEL SERVICE,
INC.:

C. Laurence Woods III
Kyle D. Johnson
Louisville, Kentucky

Mark A. Perry
Washington, D.C.

Julian W. Kleinbrodt
San Francisco, California